UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SECURITIES & EXCHANGE COMMISSION,　　:

                         Plaintiff,　　:

        *-against-*　　:

WARREN D. NADEL;　　:
WARREN D. NADEL & CO.; and　　:
REGISTERED INVESTMENT ADVISERS, LLC　:

               Defendants,　　:

        *-and-*　　:

KATHERINE NADEL　　:

           Relief Defendant.　　:
-------------------------------------------------------------X

**DECISION & ORDER**
11-CV-215 (WFK) (AKT)

**WILLIAM F. KUNTZ, II, United States District Judge:**

    The Securities and Exchange Commission ("SEC") brings this action against Defendants Warren D. Nadel ("Nadel"), Warren D. Nadel & Co. ("WDNC"), and Registered Investment Advisers, LLC ("RIA") (collectively "Defendants"), and Relief Defendant Katherine Nadel. The SEC alleges Defendants fraudulently induced clients of RIA to invest millions of dollars in an investment strategy by misrepresenting to clients and to prospective clients the amount of assets Defendants had under management and by failing to provide written notice and to obtain consent for cross-trade transactions amongst clients. Currently before the Court is the SEC's motion for partial summary judgment on its claims under Section 10(b) of the Securities Exchange Act of 1934 ("1934 Exchange Act") and Rules 10b-5 and 10b-10 thereunder, Section 17(a) of the Securities Act of 1933 ("1933 Securities Act"), and Sections 206(1), (2), and (3) of the Investment Advisers Act of 1940 ("Advisers Act"). Also before this Court is Defendants' cross-motion for summary judgment. Dkt. 81. For the reasons that follow, the SEC's motion for partial summary judgment is GRANTED. Because the Court grants the SEC's motion for summary judgment in its entirety, Defendants' motion is DENIED. *See e.g.*, *Walker v. City of New York*, 12-CV-2535, 2014 WL 6883049, at *4 (E.D.N.Y. Dec. 5, 2014) (Kuntz, J.).

**BACKGROUND**

The following facts are either undisputed or described in the light most favorable to

Defendants, the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d

Cir. 2005).

Defendant Nadel is a resident of Upper Brookville, New York. Dkt. 82 (Defendants'

Local Rule 56.1 Statement of Disputed Facts in Opposition to Plaintiff's Motion for Partial

Summary Judgment) ("SDF") at ¶ 1. At all relevant times, Nadel was the President, Chief

Executive Officer, and Chief Compliance Officer of WDNC and the President of RIA. *Id.* RIA

was an investment adviser, registered with the SEC since January 5, 2004, with a principal place

of business in Glen Cove, New York. *Id.* at ¶ 2. RIA held itself out as providing continuous

investment advice to clients in exchange for a fee, which was based upon assets under

management. *Id.* WDNC was a broker-dealer registered with the Financial Industry Regulatory

Authority ("FINRA") with a principal place of business in Glen Cove, New York. *Id.* at ¶ 3.

***The Investment Strategy***

Defendants engaged in an investment strategy known as a Preferred Stock Dividend

Capture Strategy ("Investment Strategy"), which required a high volume of transactions in

preferred utility stocks to maximize tax-preferred income while minimizing loss exposure on the

open marketplace. *Id.* at ¶ 4; Dkt. 77 (Defendants' Memorandum of Law in Opposition to

Plaintiff's Motion for Partial Summary Judgment) ("Defs.' Br.") at 2. The purpose of the

Investment Strategy was to "generate tax-favored dividend income from short-term holdings of

preferred stocks while hedging positions to preserve capital." SDF Ex. 1 ("Program Package") at

CGC-SEC 297. The Investment Strategy was marketed as "particularly suited to corporations

subject to United States federal income tax as 'C' corporations that wish to invest at least

$500,000 short-term for income. Under the [Investment] Strategy, long positions in preferred

2

stocks [would] be turned over approximately every 45 days, and the entire portfolio [would] be turned over seven or eight times in any 12 month period." *Id.*

While the Investment Strategy focused on preferred stock transactions occurring in the open marketplace, the Program Package stated that "[m]any such stocks are thinly traded. That is, many such stocks are not abundantly available in the over-the-counter markets where they trade, and, as a consequence relatively small changes in supply or demand can cause disproportionately large changes in then available bid and offered prices for such stocks." *Id.* Nonetheless, "[i]t is anticipated that most transactions in a client's account will be effected over-the-counter, not on a national exchange[.]" *Id.*

By late 2007, Defendants began conducting cross-trades between RIA's own advisory clients instead of executing trades on the open marketplace. SDF at ¶ 8. According to Nadel, uncertainty in the marketplace made preferred utilities securities illiquid, making it difficult to carry out the Investment Strategy by buying and selling securities in the marketplace. *Id.* at ¶ 9.

## *Marketing Materials*

As part of the Investment Strategy, Defendants also distributed marketing materials, such as brochures, power point presentations, firm overviews, and quarterly performance updates, to clients and to prospective clients which represented that RIA managed over $400 million in investor assets. SDF at ¶ 13. However, RIA's Form ADV[1] Part I filings with the SEC revealed that Defendants overstated the actual amount of assets under management. *Id.* at ¶¶ 13, 15. Specifically, RIA's assets under management were only $147.28 million in January 2007; $147.37 million in January 2008; $127.63 million in January 2009; and $54.84 million in

---

[1] A Form ADV is a required submission to the SEC by a professional investment advisor that specifies the investment style, assets under management, and key officers of the firm.

January 2010 – not the over $400 million that RIA claimed in its marketing materials, a fact

undisputed by Defendants. *Id.* at 15.

### *SEC Action*

Based on the above facts, the SEC filed a complaint against Defendants on January 13,

2011.  Dkt. 1 ("Complaint").   On August 25, 2011, the SEC filed an amended complaint against

Defendants alleging violations of 17(a) of the 1933 Securities Act, 10(b) of the 1934 Exchange

Act and Rule 10b-5 thereunder, Sections 206(1),(2), and (3) of the Advisers Act, Section 207 of

the Advisers Act, Section 204 of the Advisers Act and Rule 204-2 thereunder, and aiding and

abetting under 10b-10 of the 1934 Exchange Act and Section 17(a) of the 1934 Exchange Act

and Rule 17a-4 thereunder.  Dkt. 11 ("Amended Complaint") at 12-17.

Currently before this Court is the SEC's motion for partial summary judgment on its

claims under Section 10(b) of the 1934 Exchange Act, Rules 10b-5 and 10b-10 thereunder,

Section 17(a) of the 1933 Securities Act, and Sections 206(1), (2), and (3) of the Investment

Advisers Act.  Dkt. 71 (Memorandum of Law in Support of the SEC's Motion for Partial

Summary Judgement) ("SEC Br.") at 1.  With respect to these claims, the SEC seeks summary

judgment on two grounds.

"*First*, the SEC seeks judgment on its claims that Defendants misrepresented to clients

and prospective clients the amount of assets they had under management.  Although Defendants

managed between $55 to $147 million in assets during the relevant period, they routinely told

investors (in over one thousand communications) that they managed more than $300 or $400

million in client assets, overstating the truth by approximately 300% to more than 600%." *Id.*

(emphasis in original).

"*Second*, the SEC seeks summary judgment on its claims that Nadel and RIA violated Section 206(3) of the Advisers Act and 1934 Exchange Act Rule 10b-10 by conducting thousands of cross-trades among their clients, and engaging in principal transactions with client accounts, without providing required notice, and obtaining client consent, prior to each transaction. Defendants represented to investors RIA's [Investment Strategy] as a liquid 'cash management' program that utilized WDNC's expertise in dealings with broker-dealers in the market, thereby enhancing best execution for RIA's clients." *Id.* at 2. (emphasis in original).

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citations omitted). Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

The non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

## II.   Analysis

### A.   Defendants Violated Section 10(b) of the 1934 Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the 1933 Securities Act

The SEC seeks summary judgment on its claims that Defendants violated Section 10(b) of the 1934 Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the 1933 Securities Act because Defendants misrepresented to clients and to prospective clients the amount of assets they had under management.  For the reasons set forth below, the Court agrees.

To establish "a claim under section 10(b) of the [Exchange] Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, the SEC must plead that the defendant '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" *U.S. SEC v. Landberg*, 836 F. Supp. 2d 148, 153 (S.D.N.Y. 2011) (Castel, J.) (quoting *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999)).  "The same elements required to establish a section 10(b) violation and a Rule 10b–5 violation suffice to establish a violation under sections 17(a)(1)-(3) of the [Securities] Act, with the exception that scienter is not required for the SEC to enjoin violations under subsections (a)(2) or (a)(3).  The statutory language of [S]ection 17(a) is broad and bars any person in the offer of sale of any securities from directly or indirectly employing any device, scheme[,] or artifice to defraud." *Id.* (internal citations, brackets, quotations, and ellipses omitted).  The Court addresses each element the SEC must prove in turn.

6

**1. The Evidence Regarding the Elements of Scienter and In Connection with the Purchase or Sale of Securities is Undisputed**

We turn first to the elements of (1) scienter and (2) in connection with the purchase or sale of securities. Here, the SEC has produced sufficient evidence to establish that both elements have been met. SEC Br. at 7-12. Defendants neither dispute that they acted (1) with scienter and (2) in connection with the purchase or sale of securities, nor do Defendants provide any evidence to establish they did not act (1) with scienter and (2) in connection with the purchase or sale of securities. As such, there is no triable issue of fact as to the two elements of (1) scienter and (2) in connection with the purchase or sale of securities. *See Anderson* , 477 U.S. at 249 (sufficient evidence in favor of the nonmoving party is necessary to create an issue of material fact). Therefore, the only issue left for the Court to determine is whether a genuine issue of fact exists as to whether Defendants' misrepresentations were material. For the reasons set forth below, the Court finds that Defendants' misrepresentations were material.

**2. Defendants' Misrepresentations Were Material**

A false statement is material if there is "a substantial likelihood that a reasonable investor would consider the information important in his [or her] decision-making process." *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 399 (S.D.N.Y. 2002) (Leisure, J.) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231(1988)). "In other words, there must exist a substantial likelihood that the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal quotations omitted) (citing *Basic*, 485 U.S. at 231–32). While a false statement "must have been one that would have assumed actual significance in a reasonable shareholder's decision-making process, there is no requirement that the fact would have been outcome determinative. Thus, a fact may

7

be material even if it would not have changed an investor's ultimate decision." *Id.* (internal citations omitted).

Ultimately, "whether an alleged misrepresentation or omission is material necessarily depends on all of the relevant circumstances of the case, and materiality is a mixed question of both law and fact." *Id.* at 400 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Since materiality is a fact intensive determination, "the Supreme Court has noted that materiality is particularly well suited for jury determination." *Id.* (citing *TSC Indus.*, 426 U.S. at 450). However, summary judgment is appropriate where the alleged misstatements or omissions are so obviously important to an investor that reasonable minds could not differ on the question of their importance. *See e.g., id.; see also TSC Indus.*, 426 U.S. at 450. Generally, "[p]rofit statements and financial reports are of particular interest to investors." *RMED Int'l, Inc.*, 185 F. Supp. 2d at 400 (internal citations omitted). It is also "undisputed that investors rely on assets under management in deciding to which investment advisor to entrust their funds." *SEC v. Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d 355, 367 (D.R.I. 2011) (Smith, J.) (citing *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1309–10 (S.D. Fla. 2007) (Johnson, J.).

Here, the SEC argues that summary judgment is warranted because "Nadel's lies about his assets under management were unquestionably material" as a matter of law. SEC Br. at 9. The SEC claims that Nadel's statements were material because "[Nadel] gave assets under management prominent billing in [the] marketing materials as one of [the] prominent 'highlights,'" "devoted thought and energy to making his lies as persuasive as possible," and "pushed his lies on his clients relentlessly, even in the face of regulatory scrutiny[.]" *Id* at 9-10. The SEC further argues that no genuine dispute as to the materiality of Nadel's misrepresentations exists because even "Nadel's clients have uniformly testified about the

importance of Defendants' assets under management to their decisions to invest with them." *Id.*
at 10-11.

Defendants argue that summary judgment is not warranted because the accurate amount
of assets under management was disclosed in publicly-available documents. Specifically,
Defendants argue that "Nadel disclosed [the] accurate [assets under management] in [the]
publicly-filed Form ADV Part I" and "referred prospective clients . . . to the S.E.C.'s public
website to review [RIA's] publicly-available Form ADV Part I[.]" Defs.' Br. at 15. As such,
Defendants claim that "the truth was staring these sophisticated clients in the face at the time
they invested." *Id.* at 16.

Summary judgment is appropriate in this case for several reasons. First, as established
above, any reasonable investor would consider the accurate amount of assets under management
to be a material fact to consider before investing. *See Locke Capital Mgmt., Inc.*, 794 F. Supp. at
366. This is so because any reasonable investor would need accurate disclosures about assets
under management to correctly evaluate an asset manager's performance. Without such
information, an investor would have no baseline to determine the risk for his or her investment.
Moreover, Defendants themselves have demonstrated the importance they attached to the
information by not only admitting they sent marketing materials containing such misstatements,
but also by highlighting the fact they managed upwards of $300 million in assets under
management in the marketing materials. SDF at ¶ 13-16; *see also In re Facebook, Inc. IPO Sec.
& Derivative Litig.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013) (Sweet, J.) (noting the importance
defendant places on statements lends itself to materiality).

Defendants cannot attempt to circumvent the issue of materiality by arguing that the
misstatements were immaterial because the accurate information was publicly disclosed in RIA's

9

Form ADV Part I filings.  In the context of securities regulation, "[a]vailability elsewhere of truthful information cannot excuse untruths[.]" *Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956); *see also SEC v. Mozilo*, 09-cv-3994, 2010 WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010) ("[I]n an action that does not involve the fraud on the market presumption, that truthful information is available elsewhere does not relieve a defendant from liability for misrepresentations in a given filing or statement.") (internal citation omitted).  As a result, Defendants cannot be excused from liability by arguing that misleading information is immaterial if disclosed elsewhere in publicly available documents.  To hold otherwise would not only result in a disparity of information within the market but would also allow individuals to escape liability for misstatements so long as accurate information is set forth elsewhere in publicly available documents.  The Court refuses to adopt such a policy.  Moreover, Defendants cannot and do not provide any case law to establish otherwise.

Defendants also cannot attempt to circumvent the issue of materiality by claiming their clients knew the truth because they were referred to the Form ADV Part I filings.  According to Defendants, "Nadel referred prospective clients them [*sic*] to the S.E.C.'s public website to review his firm's publicly-available Form ADV Part I, and his conversations with them confirmed that they had accessed this document." Defs.' Brief at 15.  To substantiate this argument, the only evidence Defendants provide is Nadel's own self-serving statements.  Nadel testified that "[d]uring the relevant period of this action, and prior to this period, whenever a prospective client contacted me to perform diligence on the [Investment Strategy] that my firm offered [], I referred them to the S.E.C.'s website to review the [RIA] Form ADV Part I, which contained RIA's assets under management." Dkt. 79 ("Declaration of Warren D. Nadel") at ¶¶ 2-3.  Nadel also claimed that "[i]t was my understanding from my discussions with each of my

clients, who were institutional investors, that they had obtained access to RIA's Form ADV Part I before the time of their investment.  Many clients . . . obtained access to and referenced RIA's Form ADV Part I for use in performing due diligence on the [Investment] Strategy." *Id.* (naming one client as an example)

However, Defendants' only piece of evidence, the Declaration of Warren D. Nadel, must be stricken from the record with respect to statements made about assets under management.  At all times leading up to the SEC's motion for summary judgment, Nadel invoked his Fifth Amendment privilege to avoid providing testimony and discovery on the issue of assets under management.  For example, Nadel refused to answer questions about why he made false statements about the assets under management, to whom he made them, and whether the statements were intentionally made.  *See* SDF at ¶¶ 43-46.  It was not until this instant motion that Nadel attempted to provide color on these issues with respect to what information was disclosed regarding assets under management.

In *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 431 (E.D.N.Y. 1995) (Glasser, J.), the court found this similar cat-and-mouse game to be the basis for precluding affidavits at the summary judgment stage by holding "[i]n view of [Defendants'] repeated invocation of their Fifth Amendment privilege at deposition, their 'eleventh hour' attempt to avoid the consequences of asserting that privilege by submitting affidavits in opposition to the government's summary judgment motion constitutes an abuse of the discovery procedure which should not be permitted."  Here, Nadel should not be allowed to "utilize[] the Fifth Amendment in an abusive or manipulative fashion by asserting and waiving the privilege when convenient and by persistently asserting his Fifth Amendment rights throughout the pendency of this proceeding and then seeking to waive or deny the existence of the privilege on the eve of [this

motion for summary judgment]." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 85-86 (2d Cir. 1995) (internal citations, quotations, and brackets omitted). Therefore, the Declaration of Warren D. Nadel must be precluded with respect to testimony concerning assets under management for purposes of this summary judgment motion. As a result and without any additional evidence, Defendants cannot argue that the misrepresentations about the assets under management were immaterial because Defendants referred prospective clients to the SEC's website to review the Form ADV Part I filings and had conversations with prospective clients to confirm they accessed the documents.

Second, summary judgment is also warranted because the evidence in the record establishes Defendants' clients believed the misstatements about assets under management to be material. SDF at ¶ ¶ 23-30. Although Defendants attempt to suggest their clients did not think the misstatements about the assets under management were material, the testimony Defendants rely on is not only taken out of context but is also misconstrued. For example, Defendants argue that "Mr. Donabedian of Winston Wade Capital has stated that the 'precise number of assets under management in the [Investment] Strategy' was not one of his 'primary concerns in investing in the [Investment] Strategy." Defs.' Brief at 16 (internal citations omitted). However, just because Mr. Donabedian may not have believed it to be a primary concern does not mean he found it to be immaterial. Something that is considered primary is not necessarily considered material without more.

Defendants also attempt to argue that the amount of assets under management was not relevant to Patricia Canning of LWCC because it was not on her list of due diligence questions. Defs.' Brief at 16-17. This, however, is wrong. When directly asked "[f]ocusing on the assets under management of over $370 million, is that something you focused on when doing diligence

for the [Investment Strategy][,]" Ms. Canning responded "[i]t was. . . . assets under management
. . . was always a criteria that we looked at when hiring any manager.  We didn't want to be a big
fish in a little pond.  We wanted to make sure that there were enough assets under management
so that if one client left, we wouldn't be the only one left.  It was just a due diligence and a
criteria that we had[.]"  Dkt. 82-7, SDF Ex. 5 ("Deposition Transcript of Patricia Canning") at
207-208.

     Similarly, Defendants also claimed that Blyth, one of its corporate clients, found the
accurate amount of assets under management to be immaterial.  Defs'. Brief at 17.  However,
Blyth's corporate representative, Jane F. Casey, testified to the opposite.  When asked "if you
had learned that in fact the assets under management that Nadel had was something more like a
hundred to $120 million at that time, would that have been significant for you to know[,]" Ms.
Casey responded "Yes."  Dkt. 82-6, SDF Ex. 4 ("Deposition Transcript of Jane Casey") at 134.
As such, there is no evidence in the record to suggest a single one of Defendants' clients found
the misstatements about the amount of assets under management to be immaterial.

     Based on the foregoing, the evidence is sufficient to establish that the misrepresentations
about the amount of assets under management were so obviously important to investors that
reasonable minds could not differ on the question of their importance.  As a result, summary
judgment is appropriate on the SEC's claims that Defendants violated Section 10(b) of the 1934
Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the 1933 Securities Act.

## B. Defendants Violated Sections 206(1) and (2) of the Advisers Act

     The SEC also seeks to hold Defendants liable for their misrepresentations about the
amount of assets under management under Sections 206(1) and (2) of the Advisers Act.  SEC Br.
at 4-5.  For the reasons set forth below, summary judgment is appropriate on this issue as well.

Section 206 of the Advisers Act, as codified by 15 U.S.C. § 80b-6, provides in pertinent part:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly-- (1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]

15 U.S.C. § 80b-6.

It has been established that "[f]acts showing a violation Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) (Holwell, J.) (citing *SEC v. Berger,* 244 F. Supp. 2d 180, 188-89 (S.D.N.Y. 2001) (Cote, J)). Because the Court has found summary judgment to be appropriate on the SEC's claims that Defendants violated Section 10(b) and 17(a), it follows that summary judgment is also appropriate on the SEC's claims that Defendants violated Sections 206(1) and (2) of the Advisers Act.

## C. **Defendants Violated Section 206(3) of the Advisers Act**

The SEC also seeks summary judgment on its claims that Nadel and RIA violated Section 206(3) of the Advisers Act by conducting thousands of cross-trades among their clients and engaging in principal transactions with client accounts without providing required notice and obtaining client consent prior to each transaction. SEC Br. at 2. For the reasons that follow, the Court grants summary judgment on this issue.

Section 206(3) of the Advisers Act, as codified by 15 U.S.C. § 80b-6, provides in pertinent part:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly -- (3) acting as principal for his own account, knowingly to sell any security to or purchase any

security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.  The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction[.]

15 U.S.C. § 80b-6.  Unlike Section 206(1) and (2) of the Act, Section 206(3) "can be violated without a showing of fraud." *In the Matter of Geman*, SEC Release No. 1924, Exchange Act Release No. 43,963, 74 SEC Docket 852, 2001 WL 124847, at *8 (Feb. 14, 2001), *aff'd sub nom. Geman v. SEC*, 334 F.3d 1183 (10th Cir. 2003).

Here, the parties do not dispute that Defendants engaged in cross-trades.  The parties only dispute (1) whether Nadel can be considered a broker within the meaning of Section 206(3), and (2) whether a general or blanket consent is sufficient to satisfy the conditions of Section 206(3). Therefore, these are the only issues for the Court to consider for purposes of summary judgment. The Court considers each issue in turn.

### 1.  <u>Nadel is a Broker Under Section 206(3) of the Advisers Act</u>

Defendants argue that Nadel's actions did not violate Section 206(3) of the Advisers Act because he was not acting as a broker within the meaning of Section 206(3).  To support their argument, Defendants rely on the SEC's Interpretation of Section 206(3) which states "[w]e have concluded that if an investment adviser receives no compensation (other than its advisory fee), directly or indirectly, for effecting a particular agency transaction between advisory clients, the adviser would not be 'acting as broker' within the meaning of Section 206(3)." *Interpretation of Section 206(3) of the Inv. Advisers Act of 1940*, SEC Release No. 1732, 67 SEC Docket 1344, 1998 WL 400409, at *5 (July 17, 1998).  According to Defendants, Nadel was not acting as a

broker within the meaning of Section 206(3) because "[Nadel] received no compensation besides his advisory fee for effecting the cross-trading pursuant to the strategy." Defs.' Br. at 10.

At the heart of Defendants' argument is the contention that since WDNC and RIA were acting as one business enterprise, the management and brokerage functions were not separate. As such, Nadel's compensation was comprised of trading commissions, and any brokerage fees would therefore be characterized as advisory fees, precluding Nadel from being deemed a broker for purposes of Section 206(3) liability. Defs.' Br. at 13.

However, Defendants present conflicting testimony on whether or not Nadel should not be considered a broker for purposes of Section 206(3) liability. On the one hand, Defendants represented in the Program Package that WDNC and RIA were acting as one business enterprise by stating the Company has "not separated the management and brokerage functions." Program Package at CGC-SEC 298. However, in motion practice, Defendants have claimed that "[Section] 206(3) does not apply, because Nadel's broker-dealer *was a separate entity* 'not acting as an investment adviser.'" Defendants' Motion for Summary Judgment at 24 (emphasis added). Without any other evidence to suggest Nadel was not acting as a broker within the meaning of Section 206(3) of the Advisers Act (*i.e.* evidence to suggest that brokerage fees should be characterized as advisory fees), the Court cannot agree that Nadel was not acting as a broker.

Moreover, for purposes of summary judgment, the SEC has produced sufficient evidence to suggest that Nadel was acting as a broker for purposes of Section 206(3) liability. For example, the evidence suggests that Defendants' brokerage fees were not comprised of commissions but rather based on a "percentage of assets under management." Dkt. 73-27 ("Declaration of Richard G. Primoff") at Ex. AA. As such, Nadel's fees cannot be considered

"advisory fees" because they would not be based off commissions, but rather based off a percentage of assets under management. Therefore, the Court concludes that Nadel was acting as a broker for purposes of Section 206(3) liability.

## 2. **Blanket Consent is Insufficient Under the Circumstances**

The SEC argues that a general or blanket consent is not sufficient to satisfy the requirements of Section 206(3). Rather, the SEC claims one must obtain transaction-specific written notice and consent prior to engaging in cross-trade activity. SEC Br. at 13-14. To support its argument, the SEC relies on its Interpretation of Section 206(3), which states "[b]y enacting [Section 206(3)], Congress recognized that self-dealing transactions pose particular risks for abuse by investment advisors. Rather than ban them, Congress imposed a strict transaction-by-transaction disclosure and consent regiment." *Id.* at 13; *see also Interpretation of Section 206(3) of the Inv. Advisers Act of 1940*, 1998 WL 400409, at *4. As such, the SEC claims Defendants were required to receive transaction-specific consent and written notice before engaging in any cross-trading.

In contrast, Defendants claim they satisfied the written notice and consent requirement of Section 206(3) by obtaining blanket consent for all cross-trades between clients and providing significant warnings that clients would be subject to cross-trades. As part of their argument, Defendants claim the SEC cannot rely on the SEC's Interpretation of Section 206(3) – the same source of authority Defendants relied on to argue that Nadel was not a broker for purposes of Section 206(3) – because "this informal interpretation is entitled to respect only to the extent it has the power to persuade, and is thus entitled to no deference, because it was not promulgated as a formal rule through notice-and-comment rulemaking and codified in the [Code of Federal Regulations]" Defs.' Br. at 11 (internal citations and quotations omitted).

Defendants should not be allowed to use the SEC's Interpretation of Section 206(3) as a sword in some instances (*i.e.* to find Nadel was not a broker for purposes of Section 206(3) liability) and then attack its opponents for using the same sword in other instances (*i.e.* that its interpretation that blanket consents are not sufficient has no power to persuade). What is sauce for the goose is sauce for the gander. Since Defendants have already conceded the authoritative and persuasive nature of the SEC's Interpretation of Section 206(3) – something uncontested by the SEC – this Court need not reach the issue of whether or not deference should be granted to the SEC's Interpretation of Section 206(3). The Court construes each party's reliance on the SEC's Interpretation of Section 206(3) as controlling for purposes of this motion.

Because general consents are not sufficient as a matter of law under the SEC's Interpretation of Section 206(3), Defendants cannot escape liability for violating Section 206(3) by relying on blanket and general consents. *Interpretation of Section 206(3) of the Inv. Advisers Act of 1940*, 1998 WL 400409, at *4; *see also* Barry P. Barbash & David N. Solander, Am. L. Inst.- Am. Bar. Assoc., Moving Toward A Functional Regulation of Broker-Dealers and Investment Advisers: What's on the Horizon, SR029 ALI-ABA 57, 67 (2009) ("Under a long-standing SEC position, the notice and consent must be given on a transaction-by-transaction basis and cannot be blanket consent."). Additionally, Defendants have not provided any case law to establish otherwise.

Defendants also attempt to argue that because the SEC has allowed global consents in certain situations to satisfy Section 206(3), the use of global consents in this case would not violate Section 206(3). Defs.' Br. at 12. Defendants' position is meritless. For example, Defendants claim that "17 C.F.R. § 275.206(3)-2 permits the use of global consent to prospectively authorize agency cross transactions in writing, where two different investment

advisers are involved. The S.E.C.'s Interpretation of Section 206(3) provides that 17 C.F.R. §

275.206(3)-3 is a *non-exclusive* safe harbor for certain . . . transactions[.]"[2] *Id.* at 12 (internal

quotations omitted; emphasis in original). However, Defendants do not meet the necessary

requirements to trigger 17 C.F.R. § 275.206(3)-2. Under Section 275.206(3)-2(a)(3), Defendants

were required to "send[] to each such client, at least annually, and with or as part of any written

statement or summary of such account from the investment adviser or such other person, a

written disclosure statement identifying the total number of such transactions during the period

since the date of the last such statement or summary, and the total amount of all commissions or

other remuneration received or to be received by the investment adviser or any other person

relying on this rule in connection with such transactions during such period." Here, Defendants

have presented no evidence to suggest they provided clients with either (1) an annual statement

of the number of cross-transactions, or (2) the total amount of commissions received in

connection with the number of cross-transactions. Although Defendants claim that certain trade

confirmations sent to clients advised them that 90% of transactions were cross-trades, this is

simply not the case. *See e.g.*, SDF at ¶ 68; Dkt. 83-4, Ex. 11 at CGC-SEC 00001867. Nothing

in the documents suggests that 90% of the transactions were cross-trades. As a result, having

failed to meet these requirements, Defendants cannot avail themselves of Section 275.206(3)-2's

safe harbor.

Based on the foregoing, summary judgment is appropriate on the SEC's claims that

Defendants violated Section 206(3) of the Advisers Act.

---

[2] This is yet another example where Defendants attempt to use the sword of the SEC's
Interpretation of Section 206(3) to avoid liability.

**C.  Defendants Violated Rule 10b-10 of the 1934 Exchange Act**

The SEC also seeks summary judgment on its claims that Nadel and WDNC violated

Rule 10b-10 of the 1934 Exchange Act by falsely disclosing the capacity in which WDNC was

acting.  For the reasons set forth below, the Court grants summary judgment on this issue.

Rule 10b–10 requires "that the broker or dealer disclose the date, time, and price of the

transaction; the broker's or dealer's role as either agent or principal; and other information based

on whether the broker or dealer is an agent or principal." *Press v. Chem. Inv. Servs. Corp.*, 166

F.3d 529, 534 (2d Cir. 1999) (citing 17 C.F.R. § 240.10b–10).  Defendants may either disclose

this information directly to the customers, or may "rely on the fund prospectuses and other

documents *publicly* filed with the SEC to satisfy their Rule 10b–10 disclosure obligations."

*Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 128-29 (2d Cir. 2000) (emphasis added).

Here, the SEC argues that Nadel and WDNC violated Rule 10b-10 of the 1934 Exchange

Act for the period of March 1, 2008 to December 31, 2009 by "falsely stat[ing] that WDNC had

acted as agent solely for the client in an over-the-counter market transaction – they did not

disclose either that WDNC had acted as agent for both sides to the transaction, or as principal in

some of the transactions[.]"  SEC Br. at 18.

Defendants claim that no violation of Rule 10b-10 occurred because "Nadel satisfied

Rule 10b-10 by having each client sign a blanket 'Consent and Trading Authorization' for cross-

trading in Nadel's Program Package."  Defs.' Br. at 18-19.  However, Defendants' argument

misses the mark as there is no evidence in the record to suggest that Nadel's "Consent and

Trading Authorization" form was *publicly* filed with the SEC. *See Quick & Reilly, Inc.*, 218

F.3d at 128-29.

Summary judgment is warranted because the SEC has presented sufficient evidence to

establish that WDNC failed to disclose it was acting as either an agent for both sides to the

transaction or as a principal in some of the transactions as required by Rule 10b-10.  To support

its argument, the SEC relies on the Declaration of Michael Fioribello who states that "[f]or the

334 transactions identified. . . . I retrieved 257 trade confirmations (the remainder were

apparently not produced).  All of the trade confirmations were marked either with the code '08,'

'08P,' '61,' '61P,' or, in one instance, '31P,' all of which, I understand, disclose to the customer

that the transaction was handled by the broker in an 'agency' capacity, not a principal capacity."

Dkt. 76 ("Declaration of Michael Fioribello) at ¶ 16.  Other documents provided by the SEC

confirm the same.  *See e.g.*, Declaration of Richard G. Primoff at Ex. DD (trade confirmation

from June 2008 revealed a code of 61, which meant that WDNC solely acted as an "agent" as

opposed to "principal" during relevant period).

Defendants do not even attempt to dispute that trade confirmations during this period

failed to acknowledge that WDNC acted as either an agent or both sides to the transaction or as a

principal in some of the transactions.  *See* SDF at ¶ 63.  As a result, no genuine issue of material

fact exists.  See *Matsushita Electric Indus. Co., Ltd.,* 475 U.S. at 587 (once the moving party

demonstrates that no genuine issue of material fact exists, the non-moving party must come

forward with specific facts to establish a genuine issue for trial).  Therefore, summary judgment

is appropriate on the SEC's claims that Defendants violated 10b-10 of the 1934 Exchange Act.

## D.  Resolution of Relief

At this stage, the Court will not determine what, if any, relief or damages the SEC is

entitled to receive.  Accordingly, the Court respectfully directs Magistrate Judge Tomlinson to

hold a hearing to determine the appropriate relief or damages including but not limited to the

determination of a permanent injunction, disgorgement, pre-judgment interest, and any civil

penalties.  *See e.g.*, *SEC v. Renaissance Capital Mgmt., Inc.*, 09-CV-01848, 2003 WL 23353464,

at *1 (E.D.N.Y. Aug. 25, 2003) (Wall, Mag. J.), *report and recommendation adopted*, No. 00-CV-1818, 2003 WL 23353490 (E.D.N.Y. Oct. 31, 2003) (Platt, J.) *aff'd sub nom. SEC v. Andrescu*, 117 F. App'x 160 (2d Cir. 2004).

## CONCLUSION

For the reasons stated above, Plaintiff's motion for partial summary judgment, Dkt. 71, is GRANTED in its entirety.  Accordingly, Defendants' motion for summary judgment, Dkt. 81, is DENIED in its entirety.  Magistrate Judge Tomlinson is respectfully directed to hold a hearing on damages consistent with this opinion.

## SO ORDERED

Dated: April 2, 2015
      Brooklyn, New York

                                    s/WFK

                                    HON. WILLIAM F. KUNTZ, II
                                    United States District Judge