UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

                         Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**

                                                    CV 11-0215 (WFK) (AKT)

                - against-

WARREN D. NADEL, WARREN D. NADEL
& CO., and REGISTERED INVESTMENT
ADVISERS, LLC,
                         Defendants,

                -and-

KATHERINE NADEL,

                         Relief Defendant.
------------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.      PRELIMINARY STATEMENT**

        Plaintiff Securities and Exchange Commission ("Plaintiff" or "the Commission"),

brought this civil enforcement action against Defendants Warren D. Nadel ("Nadel"), Warren D.

Nadel& Co. ("WDNC") and Registered Investment Advisers, LLC ("RIA") (collectively, "the

Defendants"), and Relief Defendant Katherine Nadel, seeking damages and injunctive relief for

alleged violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b)

of the Securities Exchange Act of 1934 ("Exchange Act"), Sections 204, 206(1), (2) and (3) and

207 of the Investment Advisers Act of 1940 ("Advisers Act") as well as the applicable rules

promulgated thereunder.  *See generally* Amended Complaint ("Amend. Compl.") [DE 11].

On March 31, 2015, Judge Kuntz issued a Decision and Order granting Plaintiff's motion

for partial summary judgment and denying Defendants' cross-motion for summary judgment.

*See* DE 100.  In rendering his decision, Judge Kuntz further directed this Court to "hold a

hearing to determine the appropriate relief or damages including but not limited to the

determination of a permanent injunction, disgorgement, pre-judgment interest, and any civil

penalties." *Id*. at 21.

In accordance with Judge Kuntz's directive, this Court conducted an evidentiary hearing

on the issue of damages over four days, from July 20, 2015 through July 23, 2015.  *See* DE 102.

The Findings of Fact and Conclusions of Law, set forth below and as required by Rule 52(a) of

the Federal Rules of Civil Procedure, constitute this Court's Report and Recommendation to

Judge Kuntz.

II.   **BACKGROUND**

A.   **Judge Kuntz's Summary Judgment Decision**

1.   ***Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act***

In his decision, Judge Kuntz first addressed Plaintiff's claims that Defendants' violated

Section 10(b) of the Exchange Act, Rule 10b-5 thereunder and Section 17(a) of the Securities

Act which focused on whether "Defendants misrepresented to clients and to prospective clients

the amount of assets they had under management."  *See S.E.C. v. Nadel*, 97 F. Supp. 3d 117, 122

(E.D.N.Y. 2015).[1]  In that regard, Judge Kuntz enumerated the requisite elements giving rise to

---

[1]   For purposes of this Report and Recommendation, the Court presumes the reader's familiarity with Judge Kuntz's Summary Judgment Decision and Order, which includes a detailed statement of the underlying facts of this case.  *See* DE 100.  As such, this Court will dispense with a detailed account of the underlying facts.  The Court further points out that citations to Judge Kuntz's Decision and Order are made pursuant to the version published in the Federal Supplement.

these violations, namely, that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *Id.* (internal quotations and citation omitted). Judge Kuntz further pointed out that these same elements "suffice to establish a violation under sections 17(a)(1)-(3) of the [Securities] Act, with the exception that scienter is not required to enjoin violations under subsections (a)(2) or (a)(3)." *Id.* (alteration in original).

Turning to the second element ("scienter") and the third element ("in connection with the purchase or sale of securities"), Judge Kuntz found that "the SEC has produced sufficient evidence to establish that both elements have been met." *Id.* Specifically, Judge Kuntz held that "no triable of issue of fact [existed] as to the[se] two elements" since "Defendants neither dispute that they acted (1) with scienter and (2) in connection with the purchase or sale of securities, nor do Defendants provide any evidence to establish they did not act(1) with scienter and (2) in connection with the purchase or sale of securities." *Id.*

Having found no triable issue of fact with respect to elements (2) and (3), Judge Kuntz next focused on whether a triable issue of fact existed regarding the first element — *i.e.*, whether Defendants' misrepresentations were material. *Id.* In this regard, Judge Kuntz determined that no triable issue of fact existed and that

> [s]ummary judgment is appropriate in this case for several reasons. First, as established above, any reasonable investor would consider the accurate amount of assets under management to be a material fact to consider before investing. This is so because any reasonable investor would need accurate disclosures about assets under management to correctly evaluate an asset manager's performance. Without such information, an investor would have no baseline to determine the risk for his or her investment. Moreover, Defendants themselves have demonstrated the importance they attached to the information by not only admitting they sent marketing materials containing such misstatements, but also by

> highlighting the fact they managed upwards of $300 million in
> assets under management in the marketing materials.
>
> ***
>
> Second, summary judgment is also warranted because the evidence
> in the record establishes Defendants' clients believed the
> misstatements about assets under management to be material.

*Nadel*, 97 F. Supp. 3d at 123-25 (internal citation omitted).  In light of these findings, Judge

Kuntz determined that "the misrepresentations about the amount of assets under management

were so obviously important to investors that reasonable minds could not differ on the question

of their importance. As a result, summary judgment is appropriate" with respect to those claims.

*Id*. at 126.

## 2.   *Violation of Sections 206(1) and 206(2) of the Advisers Act*

Similar to their claims under Section 10(b) of the Exchange Act, Rule 10b-5 thereunder

and Section 17(a) of the Securities Act, Plaintiff also sought to "hold Defendants liable for their

misrepresentations about the amount of assets under management under Sections 206(1) and (2)

of the Advisers Act."  *Id*.  After reviewing the language of the controlling section of the Advisers

Act, Judge Kuntz noted that "[i]t has been established that '[f]acts showing a violation [of]

Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206

violation.'"  *Id*. (internal citation omitted) (second alteration in original).  As such, Judge Kuntz

determined that "because the Court has found summary judgment to be appropriate on the SEC's

claims that Defendants violated Section 10(b) and 17(a), it follows that summary judgment is

also appropriate on the SEC's claims that Defendants violated Sections 206(1) and (2) of the

Advisers Act."  *Id*.

### 3.   *Violation of Section 206(3) of the Advisers Act*

Judge Kuntz next addressed the Commission's allegation that "Nadel and RIA violated Section 206(3) of the Advisers Act[2] by conducting thousands of cross-trades among their clients and engaging in principal transactions with client accounts without providing required notice and obtaining client consent prior to each transaction." *Id.* at 126.  Since neither party disputed the fact that "Defendants engaged in cross-trades" in the first instance, Judge Kuntz determined that the only issues before the Court were "(1) whether Nadel can be considered a broker within the meaning of Section 206(3), and (2) whether a general or blanket consent is sufficient to satisfy the conditions of Section 206(3)." *Id.* at 127.

Turning to the first issue of whether Nadel could be considered a broker within the meaning of Section 206(3), Judge Kuntz pointed out Defendants' "conflicting testimony on whether or not Nadel should not be considered a broker for purposes of Section 206(3) liability." Coupled with the fact that Defendants did not provide "any other evidence to suggest Nadel was not acting as a broker within the meaning of Section 206(3) of the Advisers Act," Judge Kuntz did not agree that "Nadel was not acting as a broker." *Id.* at 128.  Further, Judge Kuntz determined that the Commission

> produced sufficient evidence to suggest that Nadel was acting as a broker for purposes of Section 206(3) liability. For example, the evidence suggests that Defendants' brokerage fees were not

---

[2]      Section 206(3) of the Advisers Act, codified at 15 U.S.C. § 80b-6, provides, in pertinent part, that "[i]t shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction[.]"

> comprised of commissions but rather based on a "percentage of assets under management." As such, Nadel's fees cannot be considered "advisory fees" because they would not be based off commissions, but rather based off a percentage of assets under management.

*Id.* Based upon Defendants' conflicting testimony and Nadel's own lack of evidence in light of the Commission's affirmative evidence, Judge Kuntz concluded that "Nadel was acting as a broker for purposes of Section 206(3) liability." *Id.*

The next issue addressed by Judge Kuntz was whether the Defendants' obtaining blanket consents prior to engaging in cross-trading was sufficient for compliance with Section 206(3) of the Advisers Act. *Id.* Relying on the Commission's interpretation of Section 206(3) — an interpretation which was "controlling for purposes of this motion" — Judge Kuntz found that "general consents are not sufficient as a matter of law under the SEC's Interpretation of Section 206(3)" and, consequently, "Defendants cannot escape liability for violating Section 206(3) by relying on blanket and general consents." *Id.* 128-29. Despite this finding, Defendants asserted that "because the SEC has allowed global consents in certain situations to satisfy Section 206(3), the use of global consents in this case would not violate Section 206(3)." *Id.* Although recognizing that the Commission's "Interpretation of Section 206(3) provides that 17 C.F.R. § 275.206(3)-2 is a *non-exclusive* safe harbor for certain . . . transactions," *id.* at 129 (emphasis and ellipses in original), Defendants did not present any evidence establishing that they met the criteria needed to take advantage of the safe harbor provision. *Id.*

In light of the above information, Judge Kuntz determined that "summary judgment is appropriate on the SEC's claims that Defendants violated Section 206(3) of the Advisers Act." *Id.*

### 4.   *Violation of Rule 10b-10 of the Exchange Act*

The Commission also sought summary judgment on its claim that Nadel and WDNC

violated Rule 10b-10[3] of the Exchange Act based upon "falsely disclosing the capacity in which

WDNC was acting." *Id*.  Specifically, the Commission claimed that "Nadel and WDNC violated

Rule 10b–10 of the 1934 Exchange Act for the period of March 1, 2008 to December 31, 2009

by 'falsely stat[ing] that WDNC had acted as agent solely for the client in an over-the-counter

market transaction—they did not disclose either that WDNC had acted as agent for both sides to

the transaction, or as principal in some of the transactions[.]'"  *Id*. at 130. (internal citation

omitted) (alterations in original).  In enumerating the criteria necessary to satisfy Rule 10b-10,

Judge Kuntz noted that "Defendants may either disclose this information directly to the

customers, or may 'rely on the fund prospectuses and other documents *publicly* filed with the

SEC to satisfy their Rule 10b–10 disclosure obligations.'"  *Id*. (internal citation omitted)

(emphasis in original).

In finding that summary judgment was appropriate on the Rule 10b-10 violation, Judge

Kuntz found that "the SEC has presented sufficient evidence to establish that WDNC failed to

disclose it was acting as either an agent for both sides to the transaction or as a principal in some

of the transactions as required by Rule 10b–10."  *Id*.  Further, Judge Kuntz pointed out that

Defendants never disputed the fact that "trade confirmations during this period failed to

acknowledge that WDNC acted as either an agent [f]or both sides to the transaction or as a

---

3       Rule 10b-10 "requires broker-dealers to disclose specified information in writing to
customers at or before completion of a transaction. The requirements under this section that
particular information be disclosed is not determinative of a broker-dealer's obligation under the
general antifraud provisions of the federal securities laws to disclose additional information to a
customer at the time of the customer's investment decision."  17 C.F.R. § 240.10b-10.

principal in some of the transactions" and that, as a result, "no genuine issue of material fact exists." *Id*.

**B.      Relevant Procedural History**

Following Judge Kuntz's decision, which granted Plaintiff's motion for partial summary judgment, and which further directed this Court to hold a hearing on damages, *see* DE 100, this Court scheduled a telephone conference for April 10, 2015 in order to set a date for the damages hearing. *See* April 6, 2015 Electronic Order. During the re-scheduled conference, the Court set the damages hearing for the week of July 20, 2015. *See* DE 102.

The hearing was conducted over four days, from July 20-23 2015. The Court heard testimony from the following witnesses: (1) Richard Anderson; (2) William Hedges; (3) Michael Fioribello; (4) Jane Casey; (5) Walter Boilieu; (6) Patricia Canning; (7) Warren Nadel; and (8) Katherine Nadel. At the conclusion of the hearing, the Court set a schedule for post-hearing briefs. *See* DE 124; DE 126.

**III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Commission seeks to "deter future violations of the securities laws, and to deprive Defendants of the illicit proceeds of their fraud. To that end, the Commission seeks: (1) permanent injunctions; (2) disgorgement and prejudgment interest, jointly and severally, on Defendants' ill-gotten gains; and (3) third-tier civil penalties." *See* Plaintiff Securities and Exchange Commission's Pre-Hearing Brief on Remedies ("Pl.'s Pre-Hearing Br.") [DE 107], at 2. The Court will address each of these forms of relief in turn.

## A.    Injunctive Relief

### 1.    *Applicable Law*

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d)(1) of the Exchange

Act, 15 U.S.C. § 78u(d)(1), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d),

authorize injunctive relief for violations of the securities laws.  Specifically, Section 20(b) of the

Securities Act provides that

> [w]henever it shall appear to the Commission that any person is
> engaged or about to engage in any acts or practices which
> constitute or will constitute a violation of the provisions of this
> subchapter, or of any rule or regulation prescribed under authority
> thereof, the Commission may, in its discretion, bring an action in
> any district court of the United States, or United States court of any
> Territory, to enjoin such acts or practices, and upon a proper
> showing, a permanent or temporary injunction or restraining order
> shall be granted without bond.

15 U.S.C. § 77t(b).  Section 21(d) of the Exchange Act similarly provides that

> [w]henever it shall appear to the Commission that any person is
> engaged or is about to engage in acts or practices constituting a
> violation of any provision of this chapter, the rules or regulations
> thereunder, the rules of a national securities exchange or registered
> securities association of which such person is a member or a
> person associated with a member, the rules of a registered clearing
> agency in which such person is a participant, the rules of the Public
> Company Accounting Oversight Board, of which such person is a
> registered public accounting firm or a person associated with such
> a firm, or the rules of the Municipal Securities Rulemaking Board,
> it may in its discretion bring an action in the proper district court of
> the United States, the United States District Court for the District
> of Columbia, or the United States courts of any territory or other
> place subject to the jurisdiction of the United States, to enjoin such
> acts or practices, and upon a proper showing a permanent or
> temporary injunction or restraining order shall be granted without
> bond.

15 U.S.C. § 78u(d)(1).  Likewise, Section 209(d) of the Adviser's Act states that

> [w]henever it shall appear to the Commission that any person has
> engaged, is engaged, or is about to engage in any act or practice

> constituting a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder, or that any person has aided, abetted, counseled, commanded, induced, or procured, is aiding, abetting, counseling, commanding, inducing, or procuring, or is about to aid, abet, counsel, command, induce, or procure such a violation, it may in its discretion bring an action in the proper district court of the United States, or the proper United States court of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this subchapter or any rule, regulation, or order hereunder. Upon a showing that such person has engaged, is engaged, or is about to engage in any such act or practice, or in aiding, abetting, counseling, commanding, inducing, or procuring any such act or practice, a permanent or temporary injunction or decree or restraining order shall be granted without bond

15 U.S.C. § 80b-9.

"The Supreme Court has viewed injunctive relief as necessary in [securities] actions for the basic protection of the investing public." *S.E.C. v. Bonastia,* 614 F.2d 908, 913 (3d Cir. 1980); *see S.E.C. v. China Energy Sav. Tech., Inc.*, No. 06-CV-6402, 2008 WL 6572372, at *7 (E.D.N.Y. Mar. 28, 2008). In addition, in an "action involving 'remedial statutes,' such as the federal securities laws, a district court has broad discretion to enjoin future violations of law where past violations have been shown." *S.E.C. v. U.S. Environmental, Inc.*, No. 94 Civ. 6608, 2003 WL 21697891, at *24 (S.D.N.Y. Jul. 21, 2003).

In determining whether injunctive relief is warranted in a particular case, courts must make a determination whether there exists "a substantial likelihood of future violations of illegal securities conduct." *S.E.C. v. Tavella*, 77 F. Supp. 3d 353, 359 (S.D.N.Y. 2015); *S.E.C. v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) ("*Cavanagh I*") (recognizing that injunctive relief is appropriate where the "SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition"); *but see U.S. Environmental, Inc.*, 2003 WL 21697891, at *24 (finding injunctive relief warranted upon a showing of "reasonable likelihood

10

of future violations"); *China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at \*7 (recognizing that "[i]njunctive relief is appropriate when there is a 'realistic likelihood of recurrence' of the violations") (internal citation omitted).  In order to make a finding of "substantial likelihood of future violations," courts consider the following factors:  (1) that the defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether defendant continues to maintain that his past conduct was blameless; and (5) whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.  *Tavella*, 77 F. Supp. 3d at 359; *S.E.C. v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978); *China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at \*7; *S.E.C. v. Wyly*, 56 F. Supp. 3d 394, 407 (S.D.N.Y. 2014).  Further, a permanent injunction is "particularly within the court's discretion where a violation was founded on systematic wrongdoing rather than an isolated recurrence."  *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) ("*First Jersey* ") (internal quotations omitted); *Tavella*, 77 F. Supp. 3d at 359; *China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at \*8.

### 2. *Application to the Facts*

#### i.  **Liability for Illegal Conduct**

There is no dispute that Judge Kuntz found the Defendants violated the securities laws. Specifically, Judge Kuntz determined that Defendants violated Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, Section 17(a) of the Securities Act, Sections 206(1), 206(2) and 206(3) of the Advisers Act and Rule 10b-10 of the Exchange Act.  *See Nadel*, 97 F. Supp. 3d at 117.  As such, this factor weighs in favor of granting injunctive relief.

### ii. Degree of Scienter

Defendants acted with scienter.  At the summary judgment phase of this case, Judge Kuntz noted that Defendants "neither dispute[d] that they acted [] with scienter . . . nor [did they] provide any evidence to establish they did not act [] with scienter."  *Nadel*, 97 F. Supp. 3d at 122. Although Judge Kuntz did not make a finding as to the degree of scienter involved, the Court finds for the reasons which follow that Defendants acted with a high degree of scienter.

First, for more than 18 months, Nadel and WDNC failed to provide accurate trading confirmations.  *Id*. at 130.  They did not disclose that WDNC had acted as agent for both sides to the transaction or as principal in some of the transactions.  *Id*.  The fact that they did so, notwithstanding their awareness of the inaccuracy, illustrates that the Defendants acted with a high degree of scienter.[4]  Nadel testified at the hearing that despite the change in the format of trade confirmations as of March 1, 2008 (which ceased to include transaction codes reflecting that Nadel was acting as the agent for both the buyer and the seller), Nadel nevertheless failed to alert his clients as to the inaccuracy.  *See* Testimony of Warren Nadel at July 2015 Damages Hearing at 558:17-559:1.[5]  Indeed, when asked whether it was important to "look at the capacity in which the trade confirmation was report[ed]," Nadel answered "no."  *Id*. at 570:3-6.  The testimony further demonstrates that Nadel's failure to alert his clients to the inaccuracy of these confirmations continued for an extended period of time and was never corrected.  For example, Nadel testified:

---

[4]     Judge Kuntz found that Defendants' failure to provide trading confirmations which correctly denoted whether the broker or dealer was acting in a principal or agency capacity violated Rule 10b-10 of the Exchange Act.  *See Nadel*, 97 F. Supp. 3d at 130.

[5]     All subsequent references to the record of the July 2015 Damages Hearing are designated "Hrg. Tr. at ____."

> Q:   [Y]ou also knew for an extended period of time, from March 2008 to at least September of 2009 or perhaps later, you actually knew the trade confirmations that were going out were incorrectly reporting your capacity in which you were acting on behalf of your clients, correct?
>
> A:   Yes.
>
> Q:   And you never alerted your advisory clients to that fact, right?
>
> A:   No.

Hrg. Tr. at 570:7-16. Nadel also testified that after an audit was performed by the Commission in late 2009, he got a call from the back office people at RBC and was provided with an "alpha code" that would enable him "to correct the situation by creating the information in English on the front of the confirm," which Nadel says he "implemented immediately." *Id*. at 565. However, when asked whether he was "aware of any trade confirmation that has th[e] correction that [he] referred to for any date prior to late March 2010," Nadel was unable to provide a direct response, stating only that "well, *I have no idea* when it actually was implemented." When pressed further, Nadel simply stated "I have no recollection as to when it was [implemented.] *Id*. at 565:25-566:7 (emphasis added).

Second, the magnitude, duration and persistent and ongoing misrepresentation concerning the amount of the Assets Under Management ("AUM"), coupled with the importance placed upon that figure by Defendants' clients, further supports a finding that Defendants' acted with a high degree of scienter.[6] Testimony from Defendants' clients revealed that the amount of AUM was an important criterion in determining whether to invest in Defendants' investment

---

[6]   Judge Kuntz found that Defendants' misrepresentation to both clients and prospective clients concerning the amount of assets they had under management violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. *See Nadel*, 97 F. Supp. 3d at 122.

strategy.  For example, Richard Anderson, former Treasurer of the Continental Grain Company ("CGC"), testified that AUM was an important benchmark because he "wanted to get an idea of the size of the firm . . . so that [he] didn't have to worry about [his company's] investment . . . [constituting] 25 percent of [Defendants'] assets under management."  Hrg. Tr. at 45:18-21. Similarly, Jane Casey, Chief Financial Officer of Blyth, Inc., testified that the total amount of Defendants' AUM was an important investment consideration because that AUM figure would directly impact how much her company would have invested with Defendants.  *Id*. at 248:4-10. According to Casey, if the AUM figure was "significantly less" than the amount Defendants represented, she would have been concerned in light of her company's $10 million investment. *Id*. at 248:2-10.  Likewise, Patricia Canning, Assistant Vice President and Senior Portfolio Manager of the Louisiana Worker's Compensation Corporation ("LWCC"), testified that based upon the $370 million AUM figure proffered by Defendants, she "thought it would be an acceptable type of strategy for LWCC" to invest in.  *Id*. at 364: 7-16.

Although Nadel refused to answer any questions during the hearing pertaining to AUM — instead invoking his rights under the Fifth Amendment — *id*. at 532:5-7; 585;12-13, a description of Defendants' investment strategy, as provided to Blyth, Inc. in 2007, highlights that Defendants were touting their AUM to be $404.93 million.[7]  *Id*. at 532:5-7; 585:12-13; Pl.'s Hrg. Ex. 22 at 17[8]; Hrg. Tr. at 241:23-24 (noting that Blyth, Inc. invested with Defendants in September 2007).  Moreover, these same inflated AUM claims were made to other potential

---

[7]      Judge Kuntz stated in his summary judgment decision that "Part I filings with the SEC revealed that Defendants overstated the actual amount of assets under management. Specifically, RIA's assets under management were only $147.28 million in January 2007; $147.37 million in January 2008; $127.63 million in January 2009; and $54.84 million in January 2010—not the over $400 million that RIA claimed in its marketing materials, a fact undisputed by Defendants." *Nadel*, 97 F. Supp. 3d at 120.

[8]      All page references are made pursuant to PDF page numbers.

clients via email during this same time period. *See* Pl.'s Hrg. Ex. 111 at 37 (Defendants'

investment strategy brochure provided by email to Oregon Mutual Insurance Company ("Oregon

Mutual") in 2007 highlighting AUM as $404.93 Million); Pl.'s Hrg. Ex. 112 at 1-2 (additional

marketing materials provided by Defendants to Oregon Mutual by email in late 2007 identifying

AUM as $411.63; million); Pl.'s Hrg. Ex. 113 at 1-2 (marketing materials sent to Oregon Mutual

in early 2008 identifying the amount of AUM as $414.79 million); *see also* Hrg. Tr. at 109:20-

113:12 (William Hedges testimony).

   Even an investigatory inquiry by the Commission on October 28, 2009 — which sought

substantiation for the statement on Defendants' website claiming that Defendant WDNC was

managing over $400 million — did not dissuade Defendants from continuing to misrepresent

AUM to clients.[9] *See* Pl.'s Hrg. Ex. 35 (investigatory inquiry from the Commission regarding

Defendants' AUM representation); Pl.'s Hrg. Ex. 25 at 1-3 (email dated January 22, 2010 from

Nadel to Hal Pasetsky and Adam Feldman concerning a revised brochure containing an AUM

figure of $308.70 million); Pl.'s Hrg. Ex. 36 (email dated February 3, 2010 from WDNC to

Brandon Dees at Goldman Sachs representing AUM at "[o]ver $300 Million"); Hrg.Tr. at

585:18-589:20; Pl.'s Hrg. Ex. 19 (chart denoting numerous emails misrepresenting Defendants'

AUM after October 2009); Pl.'s Hrg. Ex. 135 (underlying emails referenced in Pl.'s Hrg. Ex.

19).

   Further, despite the numerous emails sent by Defendants to clients and prospective

clients between January 2007 and March 2010 misrepresenting Defendants' AUM, *see* Pl.'s Hrg.

---

[9]  Nadel's response to the Commission's inquiry was that "[a]s a result of my review of our firm's web site in connection with the commencement of this audit, the claim as to assets under management was noted and deleted." Pl.'s Hrg. Ex. 35. Although the AUM claim may have been deleted from Defendants' website, the record demonstrates that this statement was, at best, disingenuous in as much as Defendants continued to disseminate emails misrepresenting the amount of AUM and sending these emails to prospective clients. *See* Pl.'s Hrg. Exs. 19; 135.

Ex. 19, Nadel was not truthful in written correspondence to the Commission dated September 14, 2009 in which he stated

> [t]his is to serve as my written confirmation that the above firm does not correspond via email to any existing or prospective clients. Correspondence of this nature occurs via telephone conversations or face-to-face meetings or in writing. In the event that there is any business related email correspondence, the firm policy is to print a copy and retain in a designated file if deemed to be of significance of to be deleted if determined to be otherwise.

Pl.'s Hrg. Ex. 161; Hrg. Tr. at 581:21-582:8. During the hearing, when confronted with this correspondence, Nadel confirmed that he did in fact routinely communicate with existing and prospective clients via email and when pressed as to why he made this false statement, his only response was that he had no recollection as to his reasoning. *See* Hrg. Tr. at 583:21-23; 584:15-17.

Third, the overall scope and duration of Defendants' failure to provide proper transaction-by-transaction notice and consent with respect to the cross-trading of client accounts evidenced a knowing disregard for Defendants' fiduciary obligations to their clients. This factor further illustrates Defendants' high degree of scienter.[10] Nadel's testimony at the hearing establishes that at least as of 2007, executing 90 percent or more of trades as cross-trades between client accounts was necessary to the functioning of Nadel's investment strategy. However, despite this fact, Defendants never properly apprised clients, through transaction-by-transaction notice and consent, that cross-trading would encompass the primary means of

---

[10]     Judge Kuntz found that Defendants' failure to obtain transaction-by-transaction notice and consent before engaging in principal transactions and by conducting cross-trading violated Section 206(3) of the Advisers Act. In addition, Judge Kuntz determined that "[a]lthough Defendants claim that certain trade confirmations sent to clients advised them that 90% of transactions were cross-trades, this is simply not the case . . . Nothing in the documents suggests that 90% of the transactions were cross-trades." *See Nadel*, 97 F. Supp. 3d at 129.

investment execution.  For instance, the following portion of the hearing transcript illustrates these facts:

> Q:    Did there come no point during th[e] period from January 1, 2007, to February 29, 2008, when you were aware that [cross-trading] had been the mainstay of your strategy for a period of time?
>
> A:    I realized we were doing a predominant amount of our trading amongst clients.  Yes.

Hrg. Tr., at 527:3-8.

***

> Q:    Don't you think the switch in your strategy from the 2005-2006 period, from executing trades in the marketplace to executing 90 percent or more of them only between your clients at prices you set, was a significant-enough change to include in your account disclosure forms, your program packages, your brochures, or your form ADV Part 2?
>
> A:    I believe I felt comfortable enough with the disclosure in the documents, themselves that indicated that there was a distinct possibility that there would be cross-trading amongst clients, and it was a blanket expression to that effect.   I did not specify a percentage in that statement that was signed off on by each client.

*Id*. at 522:21-523:8.  In addition, although Nadel stated that engaging in such rampant cross-trading provided "a better alternative than other options that were available . . . in the marketplace," he had no recollection as to why this information was not included in any brochures distributed to prospective clients.  *Id*. at 523:23-524:6.  Indeed, even when Nadel testified that he alone was engaging in the cross-trading, *see id*. at 527:7-11; 536:5-7, he refused to concede that as of March 2009 more than 90 percent of the trades executed were cross-trades, despite having agreed in a Stipulation dated July 17, 2015 to that overall figure.  *See id*. at 535:23-536:11; July 17, 2015 Stipulation at ¶ 2; Hrg. Tr. at 3:24-5:13 (parties verbally enter the

17

Stipulation into the record). Nadel offered only evasive and conflicting testimony on this point, claiming simply that he knew "it was over 50 percent" and contradicting his prior sworn testimony where he testified to the "over 90 percent" figure. *See* Hrg. Tr. at 536:8-17; Pl.'s Hrg. Ex. 140, at 40 (sworn investigatory testimony of Warren Nadel before the Commission on March 23, 2010).

Further, Defendants' clients Anderson, Hedges, Casey, Boilieu and Canning indicated at the hearing that the overall amount of cross-trades conducted constituted an important figure which would have determined, in part, whether they would have invested assets with the Defendants. *See* Hrg. Tr. at 47:16-48:6; 115:19-116:24; 245:9-246:3; 330:12-23; 366:6-367:18. Despite this testimony, when Nadel was asked "[w]ell isn't it a fact, sir, that you knew that if you disclosed to clients [the amount of cross-trades] before they invested, that they never would have invested with you," he responded "[n]ot really." *Id*. at 524:7-10.

In light of the foregoing information, the Court finds that Defendants acted with a high degree of scienter. This factor weighs in favor of granting injunctive relief.

### iii.  Recurring Nature of Conduct

The evidence offered at the damages hearing establishes that: (1) Defendants' cross-trading occurred at least from January 1, 2007 through December 31, 2009, *see id*. at 180:14-181:7 (Michael Fioribello testimony); Pl.'s Hrg. Ex. 9 (summary of Defendants' cross-trading activity from January 1, 2007 to February 29, 2008; Pl.'s Hrg. Ex. 10 (summary of Defendants' cross-trading activity from March 1, 2008 through December 31, 2008); (2) Defendants' material misrepresentations concerning their overall AUM occurred from January 2007 through April 2010, s*ee* Pl.'s Hrg. Exs. 19, 135; and (3) from March 2008 to at least December 2009 Defendants knew that the trade confirmations being sent to clients were inaccurate, but failed to

alert clients or correct the inaccuracy.  *See* Hrg. Tr. at 570:7-16.  As such, the Court finds that

Defendants' misconduct was ongoing and did not involve a single isolated incident.

Consequently, this factor also weighs in favor of injunctive relief.

### iv.  Appreciation of Wrongdoing

Based upon the testimony and evidence adduced at the hearing, the Court finds that

Defendants have little appreciation of the wrongdoing in which they have been found to have

engaged.  During his testimony, Nadel showed both indifference and a somewhat cavalier

attitude regarding the underlying violations.  For example, with respect to his failure to provide

clients with transaction-by-transaction notification and consent to engage in cross-trades, Nadel

appeared dismissive, stating simply that he "felt comfortable enough with the disclosure

documents" and the "blanket expression" concerning the possibility of cross-trades — despite

the fact that this approach failed to comply with Section 206(3) of the Advisers Act.  As to the

inaccurate trading confirmations, Nadel presented a similar lackluster attitude.  Indeed, Nadel

testified that he did not alert clients to the inaccuracy of the confirmations.  *See* Hrg. Tr. at

567: 3-7.  And although he initially testified that he "did not review the confirm[ations]" because

his assistant completed this job, *id.* at 567:12-13, when he was presented with his prior sworn

testimony, *see* Pl.'s Hrg. Ex. 140, which showed that he did in fact review the trading

confirmations, Nadel back-pedaled, stating that he "didn't look at the codes" because he "was

under the assumption that the codes were reflecting that [the broker was acting as agent for both

sides of the transaction]."  *See* Hrg. Tr. at 569:25-570:1.  Moreover, when presented with the

false statement made to the Commission that the Defendants did not communicate with clients

via email, *id.* at 581:21-582:8 — despite acknowledging that there "seem to be quite a few

emails," *id.* at 583:21-23 — Nadel had no recollection as to why he made the false statement.  In

any event, he continued to send out numerous emails to prospective clients containing inflated AUM claims. *See id*. at 584:15-17; 586:8-17; Pl.'s Hrg. Ex. 19.

### v. Opportunity to Commit Future Violations

Nadel has a Bachelor of Science degree in Administrative and Management Sciences from Carnegie-Mellon University and a Masters in Business Administration from New York University. Pl.'s Hrg. Ex. 22 at 27. He has worked in the financial industry over 35 years — since 1977. *Id.* at 15. Prior to starting WDNC and RIA he worked for firms such as Lehman Bros., Oppenheimer & Company and Jefferies & Company. *Id*. This long history with, and entrenchment in, the financial industry during the past 35+ years makes recurrence more likely, especially since institutional investing encompasses Nadel's primary area of expertise. *See S.E.C. v. Univ. Major Indus. Corp.*, 546 F.2d 1004, 1048 (2d Cir. 1976) (recognizing as a factor the "likelihood, because of defendant's professional occupation, that future violations might occur"); *S.E.C. v. Platinum Inv. Corp.*, No. 02 CV 6093, 2006 WL 2707319, at *4 (S.D.N.Y. Sept. 20, 2006) (same). In addition, Nadel's "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." *S.E.C. v. Tannenbaum*, No. 99-CV-6050, 2007 WL 2089326, at *3 (E.D.N.Y. Jul. 19, 2007 (quoting *Platinum Inv. Corp.*, 2006 WL 2707319, at *4); *see First Jersey*, 101 F.3d at 1477. As such, the Court finds that this factor also weighs in favor of granting injunctive relief.

In light of the above findings, the Court respectfully recommends to Judge Kuntz that the Commission's request for permanent injunctive relief against the Defendants be GRANTED.

B.      **Disgorgement**

        *1.  Applicable Law*

"Once the district court has found federal securities law violations, it has broad equitable

power to fashion appropriate remedies, including ordering that culpable defendants disgorge

their profits." *First Jersey*, 101 F.3d at 1474; *China Energy Sav. Tech., Inc.*, 2008 WL 6572372,

at *10.  Disgorgement thus functions as an equitable remedy, imposed to "forc[e] a defendant to

give up the amount by which he was unjustly enriched."  *FTC v. Bronson Partners*, 654 F.3d

359, 372 (2d Cir. 2011) (quoting *S.E.C. v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 102

(2d Cir. 1978)). To that end, disgorgement serves to remedy securities law violations by

depriving violators of the fruits of their illegal conduct.  *See S.E.C. v. Fischbach Corp.*, 133 F.3d

170, 175 (2d Cir. 1997); *see S.E.C. v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) ("The

paramount purpose of enforcing the prohibition against insider trading by ordering disgorgement

is to make sure that wrongdoers will not profit from their wrongdoing."); *see also S.E.C. v.

Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) ("The deterrent effect of an SEC

enforcement action would be greatly undermined if securities law violators were not required to

disgorge illicit profits.").  As such, by forcing wrongdoers to give back the fruits of their illegal

conduct, disgorgement also "has the effect of deterring subsequent fraud."  *S.E.C. v. Cavanagh*,

445 F.3d 105, 117 (2d Cir. 2006) ("*Cavanagh II* "); *First Jersey*, 101 F.3d at 1474.  Indeed,

without the availability of this equitable enforcement mechanism, "the deterrent effect of an SEC

enforcement action would be greatly undermined[.]"  *China Energy Sav. Tech., Inc.*, 2008 WL

6572372, at *10 (quoting *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1104).

"The district court has broad discretion not only in determining whether or not to order

disgorgement but also in calculating the amount to be disgorged." *First Jersey*, 101 F.3d at

1474–75; *see S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014), *cert. denied*, 136 S. Ct. 531 (2015); *see also S.E.C. v. Posner*, 16 F.3d 520, 522 (2d Cir. 1994) (affirming district court's order of disgorgement since "[t]he [district] court has broad discretion to tailor the sanction to the wrongful conduct involved").  Such a calculation "need only be a reasonable approximation of profits causally connected to the violation . . . any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty. " *First Jersey*, 101 F.3d at 1475 (quoting *S.E.C. v. Patel*, 61 F.3d 137, 139–40 (2d Cir. 1995)) (alteration in original); *see Tavella*, 77 F. Supp. 3d at 359; *S.E.C. v. McCaskey*, 98 Civ. 6153, 2002 WL 850001, at *4 (S.D.N.Y. Mar. 26, 2002); *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) ("The amount of disgorgement ordered by a court for violation of the securities laws need not be an exact calculation of the defendant's profits, but only "a reasonable approximation of profits causally connected to the violation."); *see also Cavanagh II*, 445 F.3d at 116 & n. 25 (noting that since disgorgement "is remedial rather than punitive, the court may not order disgorgement above" "the amount of money acquired through wrongdoing  . . . plus interest").  "Thus, once the Commission shows the existence of a fraudulent scheme in violation of federal securities laws, the burden shifts to the defendant to 'demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged.'" *S.E.C. v. Rosenfeld*, No. 97 CIV.1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001) (quoting *S.E.C. v. Benson,* 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987)); *S.E.C. v. Grossman*, 87 Civ. 1031, 1997 WL 231167, at *8 (S.D.N.Y. May 6, 1997) ("The SEC bears the burden of persuasion that its proposed disgorgement figure reasonably approximates the amount of unjust enrichment . . . once the SEC has established that the proposed amount is reasonable, the burden shifts to the

defendant to demonstrate that the amount requested is not a reasonable approximation of the unlawfully obtained profits."), *aff'd, in part, vacated, in part*, 173 F.3d 846 (2d Cir. 1999).

### 2.  Application to the Facts

#### i.  The Commission's Disgorgement Figure Represents a Reasonable Approximation of Defendants' Profits

The Commission seeks to disgorge a total of $10,959,714.30 in illicit profits which the Commission claims are causally connected to Defendants' violations.  Pl.'s Hrg. Ex. 213 at 1. Specifically, the Commission seeks to have Defendants disgorge the following streams of income received by them from January 1, 2007 through December 31, 2009:  (1) $3,432,140.85 in advisory fees charged by Defendants to clients to participate in Defendants' investment strategy, *see* Pl.'s Hrg. Ex. 213 at 1; 15 (Table 8 Amended showing the breakdown of advisory fees charged to Defendants' clients from 2007 through 2009); Hrg. Tr. at 202:17-20; (2) $5,384,443.70 constituting trading commissions paid on 5,615 unlawful cross-trades, *see* Pl.'s Hrg. Ex. 213 at 1, 9, 10[11]; and (3) $2,143,129.75 representing profits from the 71 groups of unlawful principal trades.  *See* Pl.'s Hrg. Ex. 213 at 1.

In addition to the hearing testimony elicited from Michael Fioribello, the Commission's Senior Specialized Examiner, *see* Hrg. Tr. at 179:23-24, and the exhibits introduced by the Commission substantiating the amounts noted above, the parties also entered into a Stipulation

---

[11]     Plaintiff's Exhibits 9 and 10 illustrate summary data for Defendants' 11 Corporate Advisory Clients.  Exhibit 9 encompasses the date range January 1, 2007 through February 29, 2008, while Exhibit 10 encompasses the dates of March 1, 2008 through December 31, 2009. When Column 5, "Commission on Crosses" in Exhibit 9 is added together with Column 5 in Exhibit 10, the total Commissions on Crosses is $5,404,849.40.  However during his hearing testimony, Michael Fioribello, the Commission's examiner, stated that due to a miscalculation "the commissions on crosses [in Exhibit 10] was approximately, after the change, $20,000 less than the number that is stated [in Exhibit 10]."  Hrg. Tr. at 183:15-184:16.  This accounts for the difference in the total "Commissions on Crosses" contained when summing up Column 5 in Exhibits 9 and 10 and the amount the Commission is seeking as part of Defendants' profits in conjunction with the illicit cross-trading.

confirming the above referenced amounts of advisory fees, commissions and profits received from Defendants' illicit activities between January 1, 2007 and December 31, 2009.  *See* Hrg. Tr. at 3:7-5:7.  The language of the Stipulation also provided that during this same period, the Defendants "executed 120 other groups of principal trades against their Corporate Advisory Clients on which they incurred $2,256,644.54 in losses."  *Id*. at 4:24-5:2.

In light of the Defendants' underlying violations, as determined by Judge Kuntz, *see* Section 2. A. *supra*, along with the fact that the Commission's calculations concerning Defendants' profits appear to reasonably approximate those profits causally connected to Defendants' underlying violations, *see First Jersey*, 101 F.3d at 1475, the Court finds that disgorgement in the amount of $10,959,714.30 is warranted since that figure reasonably approximates the amount of Defendants' unjust enrichment.  *See Grossman*, 1997 WL 231167, at *8.

## ii.   Defendants' Entitlement to Deductions

Although the Court finds that the Commission's figure of $10,959,714.30 constitutes a reasonable approximation of the Defendants' illicit profits, Defendants have asserted that this amount should be offset by:  (1) trading losses incurred; (2) payments made to Hal Pasetsky and two other outside individuals; (3) payment of clearing charges; and (4) payment made to Polycom.  *See* Defendants' Post-Hearing Memorandum Regarding Damages ("Defs.' Post-Hearing Mem.") at 1.  "Because the [Commission's] disgorgement calculation is 'reasonable,' the burden shifts to [Defendants] to demonstrate that they received less than the full amount sought to be disgorged."  *S.E.C. v. Svoboda*, 409 F. Supp. 2d 331, 344-45 (S.D.N.Y. 2006). The Court will address each category in turn to determine if Defendants have met their burden.

### 1. *Trading Losses*

Defendants claim that "the $2,256,644.54 in principal trading losses should be used to offset any disgorgement in this action, because such losses 'were incurred incidental to, and as part and parcel of, the intended scheme.'" Defs.' Post-Hearing Mem. at 4 (quoting *McCaskey*, 2002 WL 850001, at *8). For the reasons that follow, the Court finds that Defendants have not met their burden and thus have failed to establish that any perceived trading losses should be deducted from the total amount of disgorgement.

With respect to the 71 groups of principal trades[12] for which the Commission is seeking the profits, the record establishes that any losses actually incurred by Defendants in executing these trades were already accounted for — the Commission netted the profitable and unprofitable individual transactions which occurred within each group of the 71 groups of principal trades. This calculation is illustrated in Michael Fioribello's testimony where he explains the purpose behind "grouping" the trades comprising each principal trading transaction and the internal as well as overall calculation regarding each principal group of trades. For example, when asked why the trades were grouped together, Michael Fioribello stated:

> A:  All of the trades are grouped together in one group to give a complete picture of all of the pieces of this principal trade example; the proprietary account and the corporate advisory account, in this case.

Hrg. Tr. at 191:1-4. In addition, when describing the mechanics of principal trade number 16 (which resulted in a net profit) on Plaintiff's Hearing Exhibit 4 (chart showing commissions on principal trades from 1/1/2007 – 2/29/2008), the testimony demonstrates that internal losses within this trading group were netted out and therefore already accounted for when determining

---

[12]  A principal trade is "an example of [Defendants'] proprietary account, both buying and selling the same security on the same date but at a different price." *See* Hrg. Tr. at 185:4-6 (Fioribello testimony).

whether the trade represented an overall profit or loss.  The following testimony is illustrative of this point as it concerns principal trade number 16:

> Q:     So did the proprietary account make or lose money on those two buys?
>
> A:     The proprietary account lost money on those two buys.
>
> Q:     And over on the right you show a positive difference of 35 cents in the average price of the buys and sells.
> A:     Yes.
>
> Q:     Does that reflect that overall for that group the Nadel accounts made money on that example?
>
> A:     Yes.
>
> Q:     Okay.  Does that number take into account that on the last two buys in that example Mr. Nadel lost money?
>
> A:     Yes.
>
> Q:     And how so?
>
> A:     For this group, for this example, regardless of whether any individual made or lost money with respect to the proprietary account, I took a straight weighted average buy price and a straight weighted average sell price, and I took the difference between those prices.

*Id*. at 193:19-194:13.

In addition, as to those groups of principal trades which resulted in an overall *net loss*, the Commission is not seeking disgorgement of any of the profitable internal individual transactions and has therefore not included that profit in any of its disgorgement calculations.  As such, offsetting these amounts from the overall disgorgement figure would be improper since these internal profits were never accounted for in the first instance.  Michael Fioribello illustrated this point during his hearing testimony when he was asked:

Q:      Can you look at Exhibit 4 please. And specifically the top of page 3. And Example No. 26. Do you see that Mr. Fioribello?

A:      Yes.

Q:      And you see, over on the right, the difference in average price of buy and sells and that is in red?

A:      Yes.

Q:      So in that example, did Mr. Nadel's proprietary account make money or lose money?

A:      Lose money.

Q:      And were there any transactions within that group on which Mr. Nadel made money?

A:      Yes.

Q:      Can you explain that?

A:      With respect to the bottom three rows each for Warren D Nadel & Company proprietary account, there is one sell only at 90.625. There is each a buy at 90.45 and a buy at $90.8125. One of those two trades is the buy, at $90.45, was lower than the sell at a price of 90.625 so that particular buy resulted in a profit to the proprietary account.

Q:      And did you include that profit in any of the disgorgement figures that were calculated in your other tables?

A:      No.

Q:      Why not?

A:      I based disgorgement on examples where the weighted average price and the weighted sell to the Warren D Nadel & Company proprietary account was net positive or profit.

Q:      So is it fair to say there that that profit was netted out against the other transactions in this group that were losses.

A:      Yes.

*Id.* at 225:14-226:22.

In light of the evidence presented at the hearing, it is evident that Defendants' reliance on *S.E.C. v. McCaskey* is misplaced.  In *McCaskey*, the court rejected the Commission's disgorgement theory which was "based solely on McCaskey's sales on sixteen days, ignoring all other transactions during the more than six-month manipulation scheme."  *McCaskey*, 2002 WL 850001, at *7.  On that basis, the Court in *McCaskey* determined that losses during the balance of the manipulation period "should be considered in determining whether to order disgorgement."  *Id.*  However, in deciding that issue, the court was careful to highlight that the rejection of the Commission's theory was based solely on the "Particular *Facts of this Case.*"  *Id.* at *6 (emphasis in original).  Unlike *McCaskey* — where the Commission ignored transactions during the manipulation period that resulted in losses and otherwise did not take those into account in calculating the overall amount of disgorgement — in the case at bar, the Commission expressly considered all principal trades that occurred from January 1, 2007 through December 31, 2009.  However, as explained above, the Commission only calculated the amount of disgorgement based upon the 71 groups of principal trades that resulted in an overall net profit.  Therefore, any principal trades which included an internal profit but resulted in an overall net loss were not charged against Defendants in the first instance, nor were they factored into the Commission's calculation of disgorgement.  Consequently, such losses were netted out and in that sense were already credited to Defendants and thus should not be double-counted by offsetting these losses from the overall disgorgement figure.

In light of the above analysis, the Court respectfully recommends to Judge Kuntz that Defendants are not entitled to an offset of the $2,256,644.54 in trading losses.

### *2.  Payments to Hal Pasetsky*

Defendants also seek an offset from the total disgorgement figure for payments which Defendants characterize as "brokerage commissions" paid to Hal Pasetsky ("Pasetsky") in the amount of $2,666,486.25.  *See* Defs.' Post-Hearing Mem. at 5.  The hearing testimony establishes that Hal Pasetsky worked at WDNC, purportedly as a broker, and was paid "a percentage of brokerage commissions."  *See* Hrg. Tr. at 726:2-727:2.  Specifically, Pasetsky was paid "35 percent of commissions on a transaction-by-transaction basis and a percentage, 35 percent of the management fee."  *Id*. at 727:10-12.  In order to determine Pasetsky's monthly payment, Nadel "would add up all the commissions on each transaction and for each client, and then [Nadel] would add up the management fees upon receipt, and the summation of all of those numbers would be multiplied by 35 percent, and that was his monthly brokerage commission to be received."  *Id*. at 727:4-8.  In addition, the trading confirmations received by clients listed Pasetsky as the financial consultant.  *Id*. at 735:12-738:15.  Nadel testified that the confirmations also contained "the brokerage commission portion that was due to Mr. Pasetsky."  *Id*. at 739:2-3.

Despite Nadel's direct testimony at the hearing concerning Pasetsky's role as a broker, Nadel testified on cross-examination that only he and RBC Correspondent Services were involved in executing the cross-trades and that it was RBC which ultimately executed, processed and cleared the transactions.  *Id*. at 726:21-23; 783:21-784:11.  When questioned concerning Pasetsky's actual role in the execution of the cross-trades, Nadel testified as follows:

> Q:    Was Mr. Pasetsky involved in any of the steps you described in the execution of the cross-trades?
>
> A:    Of the actual transactions, no.
>
> Q:    He didn't negotiate any of those trades?

A:      No.

Q:      He didn't broker any of the cross-trades, did he?

A:      No.

Q:      Well, what happened is you were getting the commission
        income from RBC, and then at some point you would break
        out his share of that as well as his share of the management
        fees from RIA, and then he would be paid.  Is that fair to
        say?

A:      As is typical of a managed account at any broker firm in the
        country.

*Id.* at 785:6-19.

Based upon the testimony and evidence adduced at the damages hearing, the Court is not

convinced that any of the payments made by Nadel to Pasetsky should be deducted from the total

amount of disgorgement.  It is true that "a court may, in its discretion, deduct from the

disgorgement amount any direct transactions costs, such as brokerage commissions."  *S.E.C. v.*

*Univ. Express, Inc.*, 646 F. Supp. 2d 552, 564 (S.D.N.Y. 2009); *see Svoboda*, 409 F. Supp. 2d at

345.  However, courts have also "taken care to distinguish such costs from 'general business

expenses, such as overhead expenses, which should not reduce the disgorgement amount.'"

*Univ. Express, Inc.*, 646 F. Supp. 2d at 564 (quoting *McCaskey*, 2002 WL 850001, at *4 n. 6);

*see S.E.C. v. U.S. Envt'l, Inc.*, No. 94 Civ. 6608, 2003 WL 21697891, at *28 (S.D.N.Y. Jul. 21,

2003); *Svoboda*, 409 F. Supp. 2d at 345.  Further, where courts have deducted brokerage

commissions, the deduction is generally based upon the direct execution of trades and the

expenses incurred as a result of such trade executions.  *See Litton Inuds., Inc. v. Lehman Bros.*

*Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1077 (S.D.N.Y. 1990) ("[T]ransaction costs such as

brokerage commissions incurred by [defendant] in *executing* trades in [the company's] securities

should be deducted from any fees and commissions disgorged as profit.") (emphasis added); *S.E.C. v. East Delta Res. Corp.*, No. 10-CV-310, 2012 WL 3903478, at *7 (E.D.N.Y. 2012).

Although Defendants attempt to characterize Pasetsky's payments as brokerage commissions in the traditional sense, the testimony instead establishes that these payments were not made to Pasetsky for executing the cross-trades on behalf of Defendants since Nadel was solely responsible for trade execution. *See* Hrg. Tr. at 527:9-11; 536:4-7. The testimony further shows that Nadel himself executed the trades, received the commission income from the trades and then parsed out Pasetsky's share based upon the fee arrangement which was in place. *See* Hrg. Tr. at 785:6-19. Considering these facts, it would be illogical and contrary to the purpose behind the remedy of disgorgement to permit Defendants to offset the payments made to Pasetsky which are closer to a general business expense than a direct transaction cost. In short, any payments made to Pasetsky, which were more akin to a profit-sharing arrangement, were at best ancillary to Defendants' violations — as opposed to constituting a direct transaction cost derived from Defendants' wrongdoing. Such payments, therefore, should not be deducted. *See McCaskey*, 2002 WL 850001, at *8 (noting that expenses which are "ancillary to the fraudulent scheme" should not serve to reduce the overall amount of disgorgement).

Furthermore, "it is irrelevant for disgorgement purposes, how the defendant chose to dispose of the ill-gotten gains . . . [and therefore] payment[s] to co-conspirators are not deductible from the gross profits subject to disgorgement." *Univ. Express, Inc.*, 646 F. Supp. 2d at 564 (internal quotations and citation omitted); *see Rosenfeld*, 2001 WL 118612, at *2; *S.E.C. v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987) ("The manner in which [defendant] chose to spend his misappropriations is irrelevant as to his objection to disgorge. Whether he chose to use this money to enhance his social standing through charitable contributions, to travel around

the world, or to keep his co-conspirators happy is his own business.").  The testimony

demonstrates that Defendants opted to funnel payments to affiliates such as Pasetsky.  That

Defendants chose to do so is their own business.  However, having made that choice, they cannot

now seek to offset such ancillary payments — which do not constitute direct transaction costs —

in order to reduce the overall amount of disgorgement. Thus, it is of no moment that the funds

may have been procured for a third-party.  *See Contorinis*, 743 F.3d at 307 (recognizing that

"when third parties have benefitted from illegal activity, it is possible to seek disgorgement from

the violator, even if that violator never controlled the funds.").  Indeed, labeling someone a

broker and categorizing such payments as direct transaction costs does not make them so.

Based upon the foregoing, this Court respectfully recommends to Judge Kuntz that the

$2,666,486.25 in payments made to Hal Pasetsky *not* be deducted from the total amount of

disgorgement.[13]

### 3.  Clearing Charges

The Defendants next seek to offset the "$301,201.90[14] in clearing charges that

Defendants paid to RBC and MF Global for clearing trades in executing the transactions at

issue."  Defs.' Post-Hearing Mem. at 8.  Defendants again cite *S.E.C. v. McCaskey* for the

proposition that these clearing charges are "'direct transaction costs' that should be reduced from

---

[13]     For the reasons stated in this section, the payments totaling $218,783.33 that were made
to Nat Allen and Joe Saxton, Hrg. Tr. at 751:14-763:14, likewise do not constitute direct
transaction costs and should therefore not be applied to reduce the Defendants' total amount of
disgorgement.

[14]     The parties stipulated on the record that "the clearance charges are as stated on the front
of [Defendants'] Exhibit 103. . . ."  Hrg. Tr. at 771:20-772:3.  *See* Defendant's Hearing Exhibit
("Defs.' Hrg. Ex.") 103 at 1 (noting the total amount of clearing charges incurred from 2007-
2009 as $301,201.90).

disgorgement because they 'plainly reduce the wrongdoer's profit.'" *Id.* at 8 (quoting *McCaskey*, 2002 WL 850001, at *4).

With respect to the clearing charges, Nadel testified these were "charges for processing transactions associated with RBC with any trades that were performed." Hrg. Tr. at 751:1-2. In addition to clearing trades processed through RBC, Nadel testified that Defendants "utilized MF Global for hedging purposes of the preferred portfolio which utilized treasury bonds, futures and put options." *Id.* at 767:24-768:1. Specifically, Nadel stated that MF Global was the clearing firm used with respect to the options portion of Defendants' investment strategy. *Id.* at 751:4-7.

As noted above, the parties have stipulated that the total amount of clearing charges paid by Defendants from 2007 through 2009 is $301,201.90. *See* Defs.' Hrg. Ex. 103 at 1. The hearing testimony discloses that Defendants did indeed pay this amount to their clearing brokers. The amounts were allocated as follows: $183,026.68 to RBC, $76,411.90 to Man Financial and $41,763.32 to MF Global. *Id.*; *see* Hrg. Tr. at 765:16-767:25.

"Courts in this circuit consistently hold that a court may, in its discretion, deduct from the disgorgement amount any direct transaction costs, such as brokerage commissions, that plainly reduce the wrongdoer's actual profit." *McCaskey*, 2002 WL 850001, at *4 (citing cases); *Svoboda*, 409 F. Supp. 2d at 345; *Univ. Express*, 634 F. Supp. 2d at 564; *but see Bronson Partners, LLC*, 654 F.3d at 375 ("[I]t is well established that defendants in a disgorgement action are "not entitled to deduct costs associated with committing their illegal acts."); *S.E.C. v. Cavanagh*, No. 98 CIV. 1818, 2004 WL 1594818, at *30 (S.D.N.Y. July 16, 2004), *aff'd on other grounds*, 445 F.3d 105 (2d Cir. 2006) ("Defendants are not entitled to deduct costs associated with committing their illegal acts."); *S.E.C. v. Amerindo Inv. Advisors Inc.*, No. 05 CIV. 5231, 2014 WL 2112032, at *5 (S.D.N.Y. May 6, 2014) (same).

In light of the fact that there is some disagreement within this Circuit as to whether the direct costs associated with a defendant's illegal acts should be deducted from the overall amount of disgorgement, it is necessary to briefly review the purpose behind this remedy. "[D]isgorgement is an equitable remedy that prevents unjust enrichment" and is therefore unlike a criminal forfeiture which constitutes "a statutory legal penalty imposed as punishment." *Contorinis*, 743 F.3d at 306. As such, "disgorgement is designed to equitably deprive those who have obtained ill-gotten *gains* of enrichment. . . [and thus operates] not to punish, but to ensure illegal actions do not yield unwarranted enrichment. . . ." *Id*. at 306-07. (emphasis added); *see S.E.C. v. Lorin*, 869 F. Supp. 1117, 1121 (S.D.N.Y. 1994) (noting that the court would "not label disgorgement as a fine, penalty, or forfeiture in light of the operation of disgorgement, which merely deprives one of wrongfully obtained proceeds") (internal quotations and citation omitted).

Since the over-arching purpose of disgorgement is the prevention of a defendant's unjust enrichment by requiring the relinquishment of his "ill-gotten gains," this Court finds the cases holding that direct transaction costs may, in the court's discretion, be deducted from the total amount of disgorgement represent the correct approach since such direct costs do not constitute "gains" to a defendant. Factoring such direct costs into a disgorgement calculation would operate as a penalty, thus failing to achieve disgorgement's ultimate purpose and intent. *See S.E.C. v. Shah*, No. 92 Civ. 1952, 1993 WL 288285, at *5 (S.D.N.Y. Jul. 28, 1993); *Litton Indus., Inc.*, 734 F. Supp. at 1077.

In this case, the Commission is seeking to have Defendants disgorge, in part, $5,384,443.70 in commissions which Defendants received by engaging in 5,615 illicit cross-trades. *See* Hrg. Tr. at 4:8-15 (Stipulation). These cross-trades, which encompassed only the

preferred utility stocks, were cleared solely by RBC.  *See* Hrg. Tr. at 751:1-3.  As such, the direct

costs associated with Defendants clearing these cross-trades *i.e.* — $183,026.68, Defs.' Hrg. Ex.

103 at 1 — should be deducted from the total amount of disgorgement sought since these charges

constituted direct expenses associated with the wrongdoing which reduced Defendants' actual

profit.  *See Univ. Express*, 634 F. Supp. 2d at 564; *Svoboda*, 409 F. Supp. 2d at 345.  However,

the $76,411.90 paid to Man Financial and the $41,763.32 paid to MF Global should not be

deducted from the overall amount of disgorgement.  *See* Defs.' Hrg. Ex. 103 at 1.  The rationale

is that although "hedging" may have constituted a portion of the Defendants' investment

strategy, none of these "hedging" trades — consisting of treasury bonds, future or put options —

involved conduct that was found to have violated the securities laws.  *See* Hrg. Tr. at 767:25-

768:1.  Therefore, any profits Defendants may have made from these separate trades is not

otherwise included in the $5,384,443.70 disgorgement total for the cross-trading commissions

received.  A deduction for clearing charges incurred on these trades, then, would be is improper

since any profits garnered on such trades would not have been illegal in the first instance since

the underlying trades themselves did not violate the law.  *See Rosenfeld*, 2001 WL 118612, at *2

("A court may in its discretion, deduct from the defendant's gross profits certain expenses

incurred while garnering the *illegal profits* . . . .") (emphasis added); *S.E.C. v. Thomas James

Associates, Inc.*, 738 F. Supp. 88, 94 (W.D.N.Y. 1990) ("In determining the proper amount of

restitution, a Court may consider as an offset the sums which a defendant paid to effect a

*fraudulent transaction*.") (emphasis added).

  For these reasons, this Court respectfully recommends to Judge Kuntz that (1)

Defendants be permitted a deduction solely for the $183,026.68 in clearing charges paid to RBC

to effectuate the illicit cross-trades but (2) Defendants not be permitted a deduction for the clearing charges incurred in executing the "hedging" trades.

### 4.  Payment to Polycom

Defendants next assert that the $553,063.37 payment made by them to Polycom, one of Defendants' investors, should serve as an offset to the total amount to be disgorged.  Defendants maintain that "where a defendant 'can establish that he has repaid' alleged ill-gotten gains to an investor, 'such payments will offset his disgorgement obligation.'"  Defs.' Post-Hearing Mem. at 8 (quoting *Disraeli v. S.E.C.*, 334 F. App'x 334, 335 (D.C. Cir. 1998)).

The evidence introduced at the damages hearing established that a payment of $553,063.37 was in fact made by RIA to Polycom.  *See* Hrg. Tr. at 341.21:7-23 (Boilieu testimony); Defs.' Hrg. Ex. 63.  Further evidence established that with respect to Polycom's investment,

> in the September 2008 time frame we became aware that the portfolio was -- the Nadel portfolio was out of compliance with Polycom's investment policy, and due to that noncompliance, there was approximately -- and that's probably a rounded number, but there was approximately $1.5 million worth of loss that was on those instruments due to the fact that they were out of compliance. And by out of compliance, as to duration, meaning they had no longer the 90 days, and as to quality of instrument.

*See* Pl.'s Hrg. Ex. 209, October 28, 2011 Michael Kourey [CFO of Polycom] Deposition Transcript ("Kourey Dep."), at 45-46; Hrg. Tr. at 321:22-323:5.  The testimony supplied by Walter Boilieu at the hearing corroborated Michael Kourey's rationale concerning the promissory note issued by RIA.  When asked "what was the purpose of the note, again?," Boilieu responded that to his recollection "it had something to do with losses [Polycom] incurred to get the portfolio back into compliance with [Polycom's] investment policy, and I guess we extracted

a note from [Nadel] to make us whole for some of those losses." Hrg. Tr. at 341.11:14-20 (Boilieu testimony).

In light of this evidence, the Court finds that the promissory note issued by Defendants to Polycom for approximately $1.5 million, of which $553,063.37 was repaid, was entered into as a result of Defendants' non-compliance with Polycom's investment policy — not due to losses incurred by Polycom directly relating to or resulting from Defendants' underlying misconduct which was found by Judge Kuntz to have violated the securities laws. Thus, Defendants' attempts to characterize these funds as a repayment of an "ill-gotten gain" rings hollow.

The two cases cited by Defendants are inapposite since neither one reflects the scenario encountered here. For example, in *Disraeli*, the court specifically limited its holding to those funds which the petitioner "transferred from Lifeplan's bank account to his own" — in other words, ill-gotten gains — and determined that in such instance, these "payments will offset his disgorgement obligation." *Disraeli*, 334 F. App'x at 335. Further, the Second Circuit case cited by *Disraeli* (and noted in Defendants' Post-Hearing Memorandum) dealt with a circumstances in which the court determined that "to the extent that [defendant] pays or has paid *restitution* as ordered in the criminal judgment, such payments will offset his disgorgement obligation under the present judgment." *S.E.C. v. Palmisano*, 135 F.3d 860, 864 (2d Cir. 1998) (emphasis added). Neither of these decisions is on-point. Since Defendants' repayment to Polycom pursuant to the promissory note did not involve repayment of ill-gotten gains — but rather repayment due to non-compliance with Polycom's investment parameters — a deduction of this payment from the total disgorgement amount is not warranted.

### C.     Prejudgment Interest

#### 1.  *Applicable Law*

Whether prejudgment interest should be awarded in a case involving violation of the securities laws is "confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion." *Contorinis*, 743 F.3d at 307 (quoting *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071–72 (2d Cir. 1995)); *see First Jersey*, 101 F.3d at 1476; *Tavella*, 77 F. Supp. 3d at 360; *China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at *12.  Thus, the decision whether to award prejudgment interest is "governed by the equities, reflecting 'considerations of fairness' rather than 'a rigid theory of compensation . . . and [] the failure of securities law violators to enjoy a profit 'does not standing alone, make it inequitable to compel them to pay interest.'"  *Contorinis*, 743 F.3d at 308 (internal citations omitted).

The primary purpose behind awarding prejudgment interest is "to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government."  *Id.*; *see First Jersey*, 101 F.3d at 1476; *Tavella*, 77 F. Supp. 3d at 360.  Therefore "[r]equiring the payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."  *S.E.C. v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996); *see China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at *12.

In determining whether to award prejudgment interest, courts consider the following factors "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*First Jersey*, 101 F.3d at 1476; *see China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at *13;

*U.S. Envt'l, Inc.*, 2003 WL 21697891, at *30. "In an enforcement action brought by a regulatory

agency, the remedial purpose of the statute takes on special importance." *First Jersey*, 101 F.3d

at 1476; *see U.S. Envt'l, Inc.*, 2003 WL 21697891, at *30; *China Energy Sav. Tech., Inc.*, 2008

WL 6572372, at *13. Notwithstanding the four factors enumerated above, "the amount on which

a violator must pay prejudgment interest usually tracks the amount the party is ordered to

disgorge [and] [w]hether or not a party personally enjoyed the gains from the illegal action does

not alter this principle." *Contorinis*, 743 F.3d at 308.

      In calculating the rate of prejudgment interest to be awarded, "the Second Circuit has

approved the calculation . . . at the [Internal Revenue Service] underpayment rate, which 'reflects

what it would have cost to borrow the money from the government and therefore reasonably

approximates one of the benefits the defendant derived from its [illegal conduct].'" *Tavella*, 77

F. Supp. 3d at 360 (quoting *First Jersey*, 101 F.3d at 1476); *see U.S. Envt'l, Inc.*, 2003 WL

21697891, at *30 ("The district court generally calculates prejudgment interest by using the IRS

rates for underpayment of taxes under 26 U.S.C. § 6621(a)(1)"); *S.E.C. v. Spongetech Del. Sys.,

Inc.*, No. 10-CV-2031, 2015 WL 5793303, at *9 (E.D.N.Y. Sept. 30, 2015) (noting that the

Second Circuit has "approved" the use of the IRS underpayment rate when calculating a

prejudgment interest award).

### 2. *Application to the Facts*

      The evidence presented at the hearing illustrated that throughout the duration of the

wrongdoing, which lasted for at least two years, Defendants acted with a high degree of scienter.

*See* Hrg. Tr. at 3:24-5:7 (Stipulation); Section III. A. 2., *supra* (discussing Defendants' degree of

scienter in the context of awarding injunctive relief); *see also Svoboda*, 409 F. Supp. 2d 331

(noting that "courts have routinely awarded prejudgment interest in SEC enforcement actions where the defendant's scheme evidences a high degree of scienter"); *S.E.C. v. Musella*, 748 F. Supp. 1028, 1042-43 (S.D.N.Y. 1989); *S.E.C. v. Sekhri*, No. 98 Civ. 2320, 2002 WL 31100823, at *18 (S.D.N.Y. Jul. 22, 2002); *Shah*, 1993 WL 288285, at *6. There is another factor to be considered in addition to the duration of the wrongdoing and high degree of intent involved in the underlying violations. Because this action has been brought by the Commission — a regulatory agency — "the remedial purpose of the statute takes on special importance" and this fact, therefore, weighs in favor of awarding prejudgment interest. *Svoboda*, 409 F. Supp. 2d at 346. Likewise, Defendants enjoyed the use of the illicit funds for the period between the wrongdoing and the entry of judgment, and, as a result, it would be inappropriate to effectively reward Defendants with "an interest free loan procured as a result of [their] illegal activity." *S.E.C. v. Stone*, No. 06 CIV 6258, 2009 WL 82661, at *6 (S.D.N.Y. Jan. 13, 2009); *see S.E.C. v. Roor*, No. 99 Civ. 3372, 2004 WL 1933578, at *10 (S.D.N.Y. Aug. 30, 2004); *Univ. Express*, 646 F. Supp. 2d at 566-67 ("Because a defendant has use of the unlawful profits from the time of the wrongdoing until entry of judgment, prejudgment interest is necessary to capture the full measure of defendant's ill-gotten gains."). For these reasons, the Court, in its discretion, finds that the award of prejudgment interest is warranted.

The S.E.C.'s examiner, Michael Fioribello, testified that in calculating the amount of prejudgment interest, the Commission "uses the IRS underpayment rate." Hrg. Tr. at 205:8. "The Second Circuit has endorsed the use of the IRS underpayment rate in actions brought before the SEC" since the rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant[s] derived from [their] fraud." *Svoboda*, 409 F. Supp. at 346 (citing *First Jersey*, 101 F.3d at 1476). As

such, the Court finds that the Commission's use of the IRS underpayment rate in calculating the total amount of prejudgment interest is proper.

The total amount of prejudgment interest sought by the Commission is $2,372,401.11. *See* Pl.'s Hrg. Ex. 213 at 1; Hrg. Tr. at 205:1.  This sum was calculated "by using the [Commission's] prejudgment interest calculator . . . [which requires the user to] input the disgorgement amount and the begin and end dates of the prejudgment interest period."  Hrg. Tr. at 205:3-6.  In addition to Fioribello's testimony, the evidence produced by the Commission demonstrates that prejudgment interest was calculated on a categorical basis which was further broken down by "Quarter Range," "Annual Rate," "Period Rate," "Quarter Interest," and "Principal + Interest."  Pl.'s Hrg. Ex. 213 at  2-5 (illustrating the breakdown, by category, of the Commission's prejudgment interest calculation).  The Court takes no issue with the Commission's raw calculations.  However, because the Commission based its overall calculations on a total disgorgement amount of $10,959,714.30, and since the Court has determined that Defendants' clearing charges paid to RBC in the amount of $183,026.68 should be deducted from the total amount of disgorgement, the Commission's prejudgment interest figure will need to be revised to reflect that deduction.  *See* Defs.' Hrg. Ex. 103 at 1; *East Delta Res. Corp.*, 2012 WL 3903478, at *7 (requiring the Commission to recalculate the amount of prejudgment interest to be awarded based upon the Court's deduction of broker's commissions from total amount of disgorgement).

The Court therefore respectfully recommends to Judge Kuntz that:  (1) an award of prejudgment interest is appropriate in this case; and (2) the Commission should be required to submit a revised prejudgment interest calculation based upon the deduction of $183,026.68 in

clearing charges paid by Defendants to RBC to execute the cross-trades during the period

January 1, 2007 through December 31, 2009.

### D.    Joint & Several Liability

#### 1.   Applicable Law

"Courts have held that joint-and-several liability is appropriate in securities cases when

two or more individuals or entities collaborate or have close relationships in engaging in the

illegal conduct." *S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) (citing *First

Jersey*, 101 F.3d at 1475); *Sekhri*, 2002 WL 31100823, at *17 (citing cases).  The burden falls

upon the wrongdoer to "establish that the liability is capable of being apportioned."  *Hughes

Capital Corp.*, 124 F.3d at 455 (citing *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir.

1992)).  In this regard, the district court has wide latitude in levying disgorgement on a joint-and-

several basis.  *Hughes Capital Corp.*, 124 F.3d at 455; *China Energy Sav. Tech., Inc.*, 2008 WL

6572372, at *14.  Indeed, the imposition of this burden upon the defendant is appropriate since

> [a]lthough in some cases, a court may be able easily to identify the
> recipient of ill-gotten profits and apportionment is practical, that is
> not usually the case. Generally, apportionment is difficult or even
> practically impossible because defendants have engaged in
> complex and heavily disguised transactions. Very often defendants
> move funds through various accounts to avoid detection, use
> several nominees to hold securities or improperly deprived profits,
> or intentionally fail to keep accurate records and refuse to
> cooperate with investigators in identifying the illegal profits.
> Hence, the risk of uncertainty should fall on the wrongdoer whose
> illegal conduct created that uncertainty.

*Hughes Capital Corp.*, 124 F.3d at 455 (internal quotations and citations omitted); *see also

S.E.C. v. Boock*, No. 09 CV 8261, 2012 WL 3133638, at *3 (S.D.N.Y. Aug. 2, 2012) (finding

that joint and several liability is "particularly appropriate" when apportionment between

defendants "is difficult or even practically impossible because . . . defendants have engaged in

complex and heavily disguised transactions in an effort to conceal their fraud") (internal

quotations and citation omitted)).  In this regard, "[t]he SEC is not required to trace every dollar

of proceeds or identify misappropriated monies which have been commingled." *Spongetech Del.*

*Sys., Inc.*, 2015 WL 5793303, at *8.

### 2.  *Application to the Facts*

The evidence presented at the hearing illustrates that Nadel acted as President and Chief

Executive Officer of both WDNC, his broker-dealer, and RIA, his investment advising affiliate.

*See* Pl.'s Hrg. Ex. 111 at 18, 49 (biographical data of Warren D. Nadel noting that Nadel

"[f]ounded the firm, a securities Broker-Dealer and Registered Investment Advisor. . . .").  In

addition, during her hearing testimony, Relief Defendant Katherine Nadel, who purportedly

worked for WDNC and RIA, was asked whether "Warren D. Nadel & Company and Registered

Investment Advisers . . . work[ed] together at all ?" — to which Katherine Nadel answered

"[y]es."  Hrg. Tr. at 601:2-5 (Katherine Nadel testimony).  Later in her testimony, Katherine

Nadel confirmed that WDNC and RIA functioned as a unitary enterprise by claiming to be

responsible for the "written supervisory procedures of both firms, the RIA and the WDNC[]" and

that she kept "[m]inutes of both the IRA [*sic*] and Warren D. Na[d]el Company."  *Id*. at 602:2-3;

606:21-607:2.  Moreover, Judge Kuntz noted in his summary judgment decision that:  (1)

Defendants themselves, in arguing against a finding of liability predicated upon Section 206(3)

of the Advisers Act, asserted that "WDNC and RIA were acting as one business enterprise [and

that] the management and brokerage functions were not separate;" and (2) Defendants

represented "in the Program Package that WDNC and RIA were acting as one business

enterprise by stating the Company has 'not separated the management and brokerage functions.'"

*Nadel*, 97 F. Supp. 3d at 127 (internal citation omitted).

In light of these facts, the Court finds that imposition of joint-and-several liability upon all Defendants is warranted since it is clear that a close relationship existed among Nadel, WDNC and RIA in engaging in the illegal conduct.  *See Hughes Capital Corp.*, 124 F.3d at 455 (citing *First Jersey*, 101 F.3d at 1475); *Sekhri*, 2002 WL 31100823, at *17; *Spongetech Del. Sys., Inc.*, 2015 WL 5793303, at *8.  Likewise, Defendants have not shown through testimony at the damages hearing or otherwise that the amounts are capable of being apportioned.  *See Hughes Capital Corp.*, 124 F.3d at 455 (citing *Alcan Aluminum Corp.*, 964 F.2d at 269); *China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at *14 (recognizing that the burden is on the tortfeasor to establish that liability is capable of being apportioned and finding imposition of joint-and-several liability to be appropriate where "[d]efendants have not refuted the SEC's allegations as to the relationship between them") .

Based on these factors, the Court respectfully recommends to Judge Kuntz that Defendants be found jointly-and-severally liable for the total amount of disgorgement and prejudgment interest to be awarded.

### E.  Civil Penalties

#### 1.  *Applicable Law*

Pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d); and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), the Commission is empowered to pursue civil monetary penalties in addition to an award of disgorgement.  The imposition of civil monetary penalties is designed "to punish the individual violator and deter future violations of the securities law."  *S.E.C. v. Neurotech Dev. Corp*, No. CV 04-4667, 2011 WL 1113705, at *3 (E.D.N.Y. Feb. 28, 2011) (quoting *Tannenbaum*, 2007

WL 2089326, at *6); *see Moran*, 944 F. Supp. at 296 (noting that the primary purpose behind

civil monetary penalties are punishment of the violator and deterrence from future violations).

Courts are empowered to impose a monetary penalty "not to exceed the greater of (1) the

gross pecuniary gain to the defendant as a result of a violation, or (2) a specified amount per

violation. . . ." *Neurotech Dev. Corp*, 2011 WL 1113705, at *4; *see Tavella*, 77 F. Supp. 3d at

362. Where the Court relies upon a specified amount per violation, the maximum amount of the

monetary penalty to be imposed for each distinct violation is set forth by each governing statute[15]

which structures the penalty into three tiers — the third tier being the most serious. *See* Section

20(d)(2)(A)-(C) of the Securities Act, 15 U.S.C. § 77t(d)(2)(A)-(C); Section 21(d)(3) (B)(i)-(iii)

of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B)(i)-(iii); and Section 209(e)(2)(A)-(C) of the

Advisers Act, 15 U.S.C. § 80b-9(e)(2)(A)-(C); *Tavella*, 77 F. Supp. 3d at 362; *Tannenbaum*,

2007 WL 2089326, at *6. Under each of these statutes,

> a first-tier penalty may be imposed for any violation; a second-tier
> penalty may be imposed if the violation "involved fraud, deceit,
> manipulation, or deliberate or reckless disregard of a regulatory
> requirement"; a third-tier penalty may be imposed when, in
> addition to meeting the requirements of the second tier, the
> "violation directly or indirectly resulted in substantial losses or
> created a significant risk of substantial losses to other persons,"

*S.E.C. v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013); *see China Energy Sav. Tech., Inc.*, 2008

WL 6572372, at *15. The maximum penalty per violation — which is periodically adjusted for

inflation — for both an individual as well as a corporate entity in each tier for individual

violations occurring through March 3, 2009 are: (1) First tier, $6,500 for an individual or

$65,000 for a corporate entity per violation; (2) Second tier, $65,000 for an individual or

---

[15] The maximum statutory amounts are periodically adjusted for inflation. *See Tavella*, 77 F. Supp. 3d at 362; *China Energy Sav. Tech., Inc.*, 2008 WL 6572372, at *15. The inflationary adjustments are set forth in 17 C.F.R. §§ 201.1001-201.1005.

$325,000 for a corporate entity per violation; (3) Third tier, $130,000 for an individual or $650,000 for a corporate entity per violation. *See* 17 C.F.R. § 201.1003, Table III.  Additionally, for violations occurring after March 3, 2009 but prior to March 5, 2013, the applicable rates are as follows: $7,500 and $75,000 for first-tier violations; $75,000 and $375,000 for second-tier violations; and $150,000 and $725,000 for third-tier violations.  *See id*. at § 201.1004, Table IV. Therefore, "[s]ubject only to the applicable maximum, [t]he amount of the penalty shall be determined by the court in light of the facts and [c]ircumstances." *Tavella*, 77 F. Supp. 3d at 362 (internal quotations and citation omitted) (first alteration in original).  In that regard, [b]eyond setting maximum penalties, the statutes leave "the actual amount of the penalty . . . up to the discretion of the district court." *Razmilovic*, 738 F.3d 14, 38 (quoting *S.E.C. v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005)).

In determining whether to impose civil penalties, and if so, what the appropriate amount should be, a court should consider the following factors, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Tavella*, 77 F. Supp. 3d at 362-63; *see Haligiannis*, 470 F. Supp. 2d at 386; *Neurotech Dev. Corp*, 2011 WL 1113705, at *4; *Tannenbaum*, 2007 WL 2089326, at *6.  Despite the usefulness of these factors in "characterizing a particular defendant's actions, the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" *S.E.C. v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (quoting *Moran*, 944 F. Supp. at 296-97); *Tavella*, 77 F. Supp. 3d at 363.

## 2. *Appropriateness of Third-Tier Civil Penalties*

The Commission seeks the imposition of "maximum third tier civil [monetary] penalties"
based on Defendants' violation of the securities laws.  Plaintiff's Opening Statement, Hrg. Tr. at
8:9-12.  In response, Defendants assert that they have provided "strong evidence of their inability
to pay a civil penalty" and thus, such penalties should therefore be "waiv[ed] or significantly
reduc[ed]."  Defs.' Post-Hearing Mem., at 10.

### i.  Egregious / Recurrent Nature of Conduct and Degree of Scienter

The evidence adduced at the damages hearing, which illustrated the overall scope and
protracted nature of Defendants' misconduct, strongly supports the conclusion that the
Defendants' conduct was egregious and was executed with a high degree of scienter.  The
Court's previous analysis of Defendants' conduct, *see* Section III. A. 2. *supra*, is thus equally
applicable in this context, and for those reasons, the Court finds that each of these factors weigh
in favor of imposing third-tier civil penalties in this case.  *See Tannenbaum*, 2007 WL 2089326,
at *6 (finding Defendants' conduct encompassed a high degree of scienter, was egregious and
recurrent based upon prior discussion of these factors).

### ii.  Defendant's Conduct Resulted in the Risk of Substantial Losses

Testimony at the damages hearing from Defendants' investors establishes that not only
was there a real risk of loss based upon Defendants' misconduct, but also that investors incurred
actual losses.  For example, Richard Anderson of the CGC stated that upon terminating his
company's relationship with Defendants in September 2009, CGC incurred an overall loss when
trying to liquidate its portfolio of preferred utility stocks in the open market.  *See* Hrg. Tr.
at 81:6-86:8 (Anderson testimony).  Specifically, when asked whether CGC made or lost money
on the "last batch of securities that Mr. Nadel purchased," Anderson stated that CGC "lost

money." Anderson further stated that of the approximately $5.1 million held in preferred utility stocks at the time CGC exited Defendants' strategy, only about $4.7 million was able to be recouped from selling the portfolio on the open market. *See id*. at 84:14-86:8; Pl.'s Hrg. Exs. 44 at 10 and 46 at 3.

William Hedges of Oregon Mutual testified that during the fourth quarter of 2008, his company's board of directors decided to terminate Oregon Mutual's relationship with Defendants and directed Hedges to "liquidate the portfolio" which was managed by Defendants. Hrg. Tr. at 127:21-128:6 (Hedges testimony). At that point, although Defendants "took back one issue [that was sold to Oregon Mutual] it was nevertheless "sold as a loss." *Id*. at 128:5-10. Additionally, because Defendants were not able to timely liquidate Oregon Mutual's holdings and expressed that "little is being accomplished," *see* Pl.'s Hrg. Ex. 120 (email from Nadel to Hedges expressing depressed nature of market and inability to liquidate the portfolio), Oregon Mutual sought to liquidate its position in the open market. However, Hedges testified that after conferring with an independent money manager, *see* Hrg. Tr. at 129:10-17, Oregon Mutual decided not to liquidate its holdings since "it would have generated a *significant loss*." *Id*. at 131:10-19; *see also* Pl.'s Hrg. Ex. 121 (email from Douglas Clark to Hedges containing matrix summarizing current positions and probable liquidation prices on a per-share basis).

Jane Casey of Blyth testified that in "June 2008, [Blyth] requested an order of liquidation of the portfolio" and after Defendants were unable to timely liquidate Blyth's holdings at or near cost, Casey stated that Blyth "took custody of the portfolio . . . in December 2008." Hrg. Tr. at 261:19-262:13 (Casey testimony). Casey noted that Blyth was not interested in liquidating "at a price well below the cost [of the securities]" and therefore Blyth approached Deutsche Bank to determine if they would be able to liquidate Blyth's portfolio "at any price 95 percent or greater

than cost." *Id*. at 265:5-9; 268:24-25.  Casey stated that it took Deutsche Bank until "sometime in 2012 to liquidate the entire portfolio [because] [t]hey couldn't find buyers at 95 percent of cost or higher" and, therefore, had the securities been sold in 2009, Blyth would have incurred a loss. *Id*. at 269:3-16.  In addition, even while liquidating the portfolio, Casey stated that because the liquidation was "generally in the range of 95 percent or greater of cost [] we were generating capital losses at that point." *Id*. at 300:20-25.  Furthermore, Casey testified that there existed the ongoing risk of sustaining an actual loss based upon the "capital value of the securities, and . . . [the] potential depreciation of the value based on interest rates." *Id*. at 307:5-12.

Walter Boilieu of Polycom testified that the process of liquidating the portfolio which Polycom held with Defendants began during the fourth quarter of 2009.  Hrg. Tr. at 341.5:22-23.[16]  On April 6, 2010, Polycom terminated its relationship with Defendants, *see* Pl.'s Hrg. Ex. 30, and "over the life of the portfolio [determined that they sustained] a cash loss of a million 7 on the original 50 million invested."  Hrg. Tr. at 341.10:17-23; Pl.'s Hrg. Ex. 30.  In addition, when asked whether Polycom incurred a "cash loss on the last set of securities that Mr. Nadel purchased" Boilieu stated:

> [y]es.  Back to the amount we had written it down to, the FTID value of $6.5 million, we only were able to recover $700,000 more than that to make us whole.  So we were still short the 5.7 million that would have taken us back to the cost on the Nadel portfolio as of March 2010.

Hrg. Tr., at 341.16, at 10-17; Pl.'s Hrg. Ex. 106.  On cross-examination, Boilieu did state that he could not be sure whether the promissory note payment and dividends received were calculated into the $48.3 million total cash withdrawn and thus, conceded that the overall loss could have been approximately $800,000.  Hrg. Tr. at 342:25-343:12.

---

[16]     The citation format used to refer to certain portions of Walter Boilieu's testimony differs from the overall citation format due to an alteration in the pagination of the hearing transcript.

Patricia Canning of LWCC testified that Defendants' services were terminated in May or June of 2009 and that LWCC took control of its portfolio in "late September or October of 2009." Hrg. Tr. at 371:12-15 (Canning testimony). Canning stated that if LWCC had sold its holdings as of September 30, 2009 — shortly after ending their relationship with Defendants — they would have sustained an approximate $3 million loss. *See id*. at 409:7-20. In addition, Canning highlighted the fact that LWCC incurred a $2.8 million loss on liquidation trades made from October 1, 2009 through December 31, 2009. *Id*. at 410:21-22. However, Canning clarified that "as of the date of liquidation of the portfolio in total, the amount of dollars in, received, versus the amount of dollars that was expended, turned out to be very close. About break even." *Id*. at 412:12-15; *see* Pl.'s Hrg. Ex. 93.

Each of the above investors testified at the damages hearing that their investments with Defendants were either placed at risk of sustaining substantial losses or in fact did sustain substantial losses on their initial investment. The risk and / or actual loss was thus directly related to and resulted from each investor's reliance on Defendants' investment strategy, components of which were found to violate the securities laws. As such, based upon the foregoing evidence, the Court finds that at a minimum, there existed a clear and substantial risk of loss to Defendants' investors based upon the underlying statutory violations. Therefore, this factor weighs in favor of imposing third-tier civil penalties.

### iii.  Defendants' Financial Condition

Nadel testified at the damages hearing that he is not employed at the present, has not worked for the past five years and has no viable source of income at present. *See* Hrg. Tr. at 669:4-9. In terms of his monthly expenses, Nadel stated that these total $8,700, including $2,150 in insurance premiums and $2,200 in medical expenses. *See id*. at 673:13-674:10; Defs.'

Hrg. Ex. 89.  According to Nadel, he currently has total assets of $4.4 million and total liabilities of $5,376,057, for a total net worth of negative $975,197.  *See id*. at 669:688:15-17.  These figures were also included on a chart prepared by Nadel in which he "listed assets and liabilities for [him]self, [his] family and any corporate entity that [he] owned."  *Id*. at 688:5-9; Defs.' Hrg. Ex. 99 at 10.  Further, Nadel testified that for tax years 2011, 2012 and 2013, for which he filed jointly with his wife, he earned zero taxable income and was projected to earn zero taxable income for tax year 2014.  *See id*. at 677:15-680:23; Defs.' Hrg. Ex. 99 at 2841 (Nadel's joint tax return for 2012), 2981 (Nadel's joint tax return for 2013).

Tax return information was also provided with respect to Nadel's three corporate entities — RIA, WDNC and Emancipation Corporation.  The testimony and exhibits presented illustrated that with respect to RIA, for calendar years, 2012 and 2013, no gross receipts were recorded and losses of $15,000 and $123,655 were sustained for these years respectively.  *See id*. at 682:8-683:19; Defs.' Hrg. Ex. 99 at 2499, 2536.  For calendar year 2011, RIA earned $146,504 in total income but sustained an ordinary business loss of $-70,086.  *See id*. at 683:20-684:6; Defs.' Hrg. Ex. 99 at 2433.  Similarly, for calendar years 2011, 2012 and 2013, WDNC earned zero dollars in gross receipts and sustained an overall operating loss of $446,786, $135,851 and $38,479 in each year respectively.  *See id*. at 684:20-686:16; Defs.' Hrg. Ex. 99 at 3106, 3144, 3179.  With respect to Emancipation Corporation, Nadel stated that for tax year 2013, Emancipation Corporation incurred a loss of $162,919.  Moreover, he expected that income would not exceed losses during calendar year 2014.  *See id*. at 687:9-20; Defs.' Hrg. Ex. 99 at 2338.

With respect to his real estate holdings, Nadel testified that he currently has "approximately $4.1 million" in outstanding mortgage loans.  *Id*. at 698:18-21.  Nadel personally

owns two residential properties in New York and New Jersey while his corporate entity,

Emancipation Corporation, owns two properties in New York (one residential and one

commercial) and one vacation property on the island of Turks and Caicos.  *Id*. at 692:24-

693:694:7.  With respect to the two residential properties personally owned by Nadel in New

York and New Jersey, the evidence established that significant mortgage liabilities exist on each

property that are past due.  Specifically, Nadel owes at least $748,941.83 on his New York

residence.  On his New Jersey residence, he owes $968,485.99 on his second mortgage and

$354,824.32 on his first mortgage, along with $48,467.41 in unpaid escrow funds.  *Id*. at 699:5-

704:12; Defs.' Hrg. Ex. 99 at 216-217, 220.  Although Nadel's two personally held residential

properties have significant mortgage balances, the properties held by Emancipation Corporation

are "all current" with respect to any mortgage liability.[17]  *Id*. at 707:15-19.  Nadel presented no

documentary evidence of the outstanding mortgage on the Turks and Caicos property, *see id*.

at 710:6-16, but he did present cancelled checks made out to "Tamarro TC LTD" in the amount

of $10,193.00 which Nadel claimed were "monthly mortgage payments for the property in Turks

and Caicos."  *Id*. at 712:25-713:3; 714:19-24; Defs.' Hrg. Ex. 99 at 17.

　　　　In addition to the above debt, Nadel claims to owe $142,977 in credit card debt.

*See* Defs.' Hrg. Ex. 99 at 10.  However, at the time of the hearing, Nadel produced only a

statement with respect to his corporate American Express account for which he owes $7,977.39.

*See id*. at 3. Further, although he claims to owe over $200,000 in "professional services," Nadel

did not provide receipts substantiating the vast majority of these expenses.

---

[17]　　　Nadel also testified that the property owned by Emancipation Corporation which was
located in Brentwood, New York, has since been sold and therefore "that would reduce the item
*asset real estate Emancipation New York* from $520,900 to $260,900."  Hrg. Tr. at 722:17-21
(emphasis in original).

With respect to tax liabilities, Nadel provided evidence that he owes approximately $249,826.84 to the Internal Revenue Service and $80,787.20 to the New York State Division of Taxation and Finance. *Id*. at 718:719:15; Defs.' Hrg. Ex. 99 at 201, 222. Nadel also provided evidence that he owes $222,034.63 to Navient for unpaid student loans. *Id*. at 721:6-722:16; Defs.' Hrg. Ex. 112.

Despite his seemingly bleak financial picture, there was evidence presented that Nadel may not be quite so destitute. First, the evidence shows that Nadel withdrew over $2 million from individual retirement accounts between 2010-2012, *see* Defs.' Hrg. Ex. 99 at 1126-1139 ($1.9 million withdrawal in 2010); 1212-1218 ($146,000 withdrawal in 2011); 1226-1232 ($82,000 withdrawal in 2012). As of 2012, both Nadel and his wife held over $500,000 in assets in multiple brokerage and / or retirement accounts. *Id*. at 1246 ($141,546.83 held at TD Ameritrade in Acct. ending 807191), 1420 ($55,715.62 held at TD Ameritrade in Acct. ending 698796), 1600 ($223,829.10 held at TD Ameritrade in Acct. ending 913748), 1776 ($59,240.82 held at TD Ameritrade in Acct. ending in 730456), 1975 ($68,860.28 held at TD Ameritrade in Acct. ending 698545). During the hearing, Nadel did not address these particular funds or otherwise produce records establishing the whereabouts of this money at the present time. However, when pressed regarding IRA withdrawals in general, Nadel stated "I don't consider taking money out of an IRA [and] putting it into a firm [and] paying myself necessarily a stream of income. . . ." Hrg. Tr. at 841:22-25.

Moreover, when questioned regarding certain bank account transfer activity, Nadel was vague and somewhat evasive in his responses. For example, when questioned concerning a $214,937.47 deposit into his joint checking account and an immediate withdrawal on the same date of $200,000 into two unidentified savings accounts, Nadel responded:

> Q:     What does [the $214,937.47] correspond to?  Or why did
>        you receive that amount?
>
> A:     I don't specifically recall
>
> Q:     Do you see the entry below dated the same date?  Do you
>        see that?
>
> A:     Yes, I see the $200,000 withdrawal.
>
> Q:     You see two withdrawals of 100[,000]?
>
> A:     Actually, transfer to savings account.
>
> Q:     The first one is to savings 5580.  Is that the one that you believe may be
>        your daughter's savings account, sir?
>
> A:     I honestly don't remember.
>
> Q:     What about the savings 7357?  Does that refresh your memory as to whose
>        savings account that is?
>
> A:     No.

*Id*. at 805:14-806:6.  Despite the above testimony and Nadel's seeming inability to recollect whether the first $100,000 transfer to a savings account ending in 5580 was an account held by his daughter, Nadel had nevertheless previously testified that he believed the account ending in 5580 was, in fact, his daughter's account.  *See id*. at 801:12-17.

Another area which Nadel neglected to fully explain during his testimony involved the receipt of a significant amount of rental income on the properties held by Emancipation Corporation between 2011 and 2013.[18]  For example, although Nadel highlighted the fact that in 2013 Emancipation Corporation had no gross receipts or sales and operated at a loss of -$162,919, *see id*. at 687:9-16, he neglected to identify or explain the $531,095 in rental income that Emancipation Corporation received in tax year 2013.  *See* Defs.' Hrg. Ex. 99 at 2338, 2345.

---

[18]     Nadel confirmed that he was the owner of Emancipation Corporation.  Hrg. Tr. at 818:10-11.

Similarly, Nadel did not address or explain the $543,291 in rental income received in 2012 nor the $569,162 received in 2011.  *See id.* at 2275, 2283, 2218.  When confronted with this information, Nadel disavowed the receipt of rental income, claiming instead that rental income "goes right into Emancipation Corporation and [] is paid out to mortgage payments.  It was not income that I would sit there and wait with my bushel basket to pick up."  Hrg. Tr. at 818:6-9. However, since Nadel is the owner of Emancipation Corporation, *see id.* at 818:10-11, these payments would have effectively been made to him in any event.  Nevertheless, Nadel could not account for the receipt of these funds other than to suggest that the funds were used to pay mortgage payments.  *See id.* at 818:4-15.

Nadel was also unable to produce rental statements or any other documentation for any of the three properties currently held by Emancipation Corporation.  *Id.* at 818:10-11819:4-11. Moreover, certain deposits credited to Emancipation Corporation's corporate bank accounts, along with wire transfers from the Caribbean (where his property in Turks and Caicos is located), belie the notion that he is unable to properly account for these as well as other sums.  *See, e.g.*, Defs.' Hrg. Ex. 99 at 3520  (wire transfer in the amount of $23,916.59 made on January 1, 2014 from the Grace Bay Club[19] into Acct. ending 9876); 3624 (deposit in the amount of $50,000 made on March 23, 2015 from Acct. ending 6075).

Although Nadel's present and future financial condition, as presented through hearing testimony and documentary evidence, does not appear to be robust, there are some gaps and otherwise fairly sizable amounts of income which have thus far been unexplained.  As such, the Court finds that this factor weighs narrowly in favor of the imposition of third-tier civil penalties.

---

[19]     The Grace Bay Club is the name of the residential complex located on Turks and Caicos where Nadel owns a villa.  Hrg. Tr. at 694:4-12.

### 3.  Imposition and Amount of Penalty

After considering all of the above factors in conjunction with the unique factual circumstances which exist in this case, the Court finds that the imposition of a third-tier penalty is appropriate.  *See Opulentica*, 479 F. Supp. 2d at 331 (quoting *Moran*, 944 F. Supp. at 296-97); *Tavella*, 77 F. Supp. 3d at 363; *see also Neurotech*, 2011 WL 1113705, at *4 (imposition of third-tier penalty appropriate where defendants made misleading statements and engaged in reckless conduct); *East Delta Resources*, 2012 WL 3903478, at *9.  As such, having determined that imposition of a third-tier penalty is appropriate, the remaining issue is the proper amount to be imposed.

Nadel's conduct was egregious, deliberate, and resulted in the risk of significant losses and continued for a span of several years.  As such "the seriousness of [Defendants'] wrongdoing justifies a serious punitive response."  *Spongetech Del. Sys., Inc.*, 2015 WL 5793303, at *11.  In addition, Nadel's failure to acknowledge his wrongdoing must also be taken into consideration in calculating the total amount of the penalty to be levied.  *See McCaskey*, 2002 WL 850001, at *14; *S.E.C. v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001); *Moran*, 944 F. Supp. at 297.  However, the Court is also mindful that "despite the severity of [Defendants'] violations and the extent to which those violations should be punished . . . the Court also considers the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect."  *Univ. Express, Inc.*, 646 F. Supp. 2d at 568.  In addition, although gaps admittedly exist in Defendants' overall financial picture, the Court cannot ignore the documentary evidence presented — including tax returns for the individual and corporate Defendants, tax liability notices, mortgage lien notices, student loan accounting and at least some bank account statements — evidencing Defendants' distressed financial condition which lends

some credence to the assertions of their inability to pay a maximum monetary penalty on top of an award of disgorgement and prejudgment interest.

In light of the above, and mindful of the fact that "to withhold the remedy of [a civil] penalty simply because a swindler claims that she has already spent all the loot and cannot pay would not serve the purposes of the securities laws," *S.E.C. v. Inorganic Recycling Corp.*, No. 99 Civ. 10159, 2002 WL 1968341, at *4 (S.D.N.Y. Aug. 23, 2002), the Court finds that the imposition of a third-tier civil penalty in the amount of $1,000,000 is appropriate.  *See Univ. Express, Inc.*, 646 F. Supp. 2d at 568 (levying a monetary penalty of $1,000,000 and noting that this amount was appropriate since defendant would already be required to pay $13 million in disgorgement and prejudgment interest and had been permanently enjoined from participating in trading stock); *Svoboda*, 409 F. Supp. 2d at 348 (viewing defendant's financial submissions "with skepticism" but determining that imposition of over $3 million in civil penalties on top of $2.2 million "already imposed . . . and the $300,000 fine assessed . . . goes too far" and instead imposing a lesser penalty amount); *Neurotech*, 2011 WL 1113705, at *6 (finding that defendant's "current situation and the other remedies awarded against him . . . [warrant] a reduced penalty [which] would serve the purpose of deterring future conduct"); *but see Spongetech Del. Sys., Inc.*, 2015 WL 5793303, at *11 (imposing maximum third-tier civil penalties but noting that despite defendant's submission of a financial affidavit in support of his inability to pay a penalty, "he failed to make any showing regarding his actual financial condition . . . [and] has not supported his claims with any documentation. . . .").

Based upon the foregoing assessment, the Court respectfully recommends to Judge Kuntz that a third-tier civil penalty be imposed upon Defendants in the amount of $1,000,000.

F.      **Liability of Relief Defendant**

1.  *Applicable Law*

"Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.  *Cavanagh I*, 155 F.3d at 136; *see Contorinis*, 743 F.3d at 307-08 (noting that since "disgorgement is designed to equitably deprive those who have obtained ill-gotten gains of enrichment, it may be imposed upon innocent third parties who have received such ill-gotten funds and have no legitimate claim to them."); *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010) ("District courts may only require disgorgement of the assets of a relief defendant upon a finding that she lacks a 'legitimate claim.'").  Thus, "[w]hen there has been no consideration given for the receipt of the ill-gotten gains, there is no legitimate claim to the funds and a relief defendant must return the proceeds." *S.E.C. v. Aimsi Techs., Inc.*, 650 F. Supp. 2d 296, 304 (S.D.N.Y. 2009).

2.  *Application to the Facts*

The Commission seeks to disgorge from Relief Defendant, Katherine Nadel, the sum of $807,346.51 in ill-gotten gains in addition to $156,033.03 in prejudgment interest calculated on that amount.  *See* Plaintiff Securities and Exchange Commission's Post-Hearing Brief on Remedies ("Pl.'s Post Hearing Br.") at 19.  As such, the total amount sought to be disgorged from the Relief Defendant is $963,379.85.  *See* Pl.'s Hrg. Ex. 208.  The Commission provided underlying support for the principal amount of disgorgement in the form of a Declaration from Warren D. Nadel as well as Schedule K-1 forms showing distributions made to Katherine Nadel from RIA.  Based upon these submissions, the Court finds that the principal amount is adequately substantiated.  *See* Pl.'s Hrg. Ex. 138 at ¶ 20 (showing chart prepared by Warren D.

58

Nadel outlining direct compensation amounts paid by WDNC to third-parties for calendar years 2007-2009); Pl.'s Hrg. Exs. 20 at 2, 4; 173 at 18 (Schedule K-1 forms for Katherine Nadel showing distributions made from RIA).[20]  In addition, the Commission's examiner Fioribello stated during the damages hearing that the amount of prejudgment interest was calculated using the Commission's prejudgment interest calculator, which itself uses the Internal Revenue Service underpayment rate.  *See* Hrg. Tr. at 205:16-206:2; Pl.'s Hrg. Ex. 208.  The Court therefore finds an adequate factual basis substantiating the amount of prejudgment interest sought.

In light of the fact that the Relief Defendant received a total of $807,346.51 from RIA and WDNC between calendar years 2007 and 2009 — which  encompassed the violations period in this case — the Court finds that these funds constituted ill-gotten gains to the Relief Defendant.[21]  Therefore, the sole issue for the Court to determine is whether the Relief Defendant had a legitimate claim to these funds.  *See Cavanagh I*, 155 F.3d at 136; *Contorinis*, 743 F.3d at 307-08.

---

[20]     In  a footnote in their post-hearing brief, Defendants allege that "the Schedule K-1 Instructions make clear that one should 'not include the amount of property distributions included in the partner's income.'"  Def.'s Post-Hearing Br. at 14 n. 8 (citing I.R.S. 2014 Instructions for Schedule K-1 at 2).  However, Defendants have not provided any case law supporting this proposition, nor has this issue been properly put before the Court in Defendants' post-hearing brief.  As such, the Court declines to consider the issue and notes that in any event, even if the distributions are not treated as "income" from a taxation perspective, the Schedule K-1 clearly shows that a distribution was made in cash to the Relief Defendant and thus there is at least a strong inference that the Relief Defendant took custody of these funds.

[21]     The Court notes that in their post-hearing brief, Defendants did not argue against the assertion by the Commission that the Relief Defendant  received ill-gotten funds, other than with respect to the perfunctory argument made by Defendants in note 8 of their brief which the Court has previously addressed.  *See* n. 20 *supra*.

At the damages hearing, the Relief Defendant testified concerning the duration and scope of her employment with WDNC and RIA.  In addition, Plaintiff introduced the Relief Defendant's earlier deposition testimony taken on August 3, 2011.  *See* Pl.'s Hrg. Ex. 176.[22]

During her deposition, the Relief Defendant testified that she was trained as a registered nurse and that apart from a few credits taken at Mercy College in the field of psychology, she had no other post-high school education and did not hold any other professional licenses.  Pl.'s Hrg. Ex. 176, 10:6-11:6.  After working in the field of nursing for approximately 13 years, and following a period of unemployment, the Relief Defendant went to work for her husband, Warren Nadel, in 2000.  *Id*. at 11:13-25.  With respect to her duties at WDNC, the Relief Defendant stated she performed primarily "secretarial kind of work" which included decorating the office, ordering supplies and keeping the office and facility clean.  *Id*. at 12:4-14.  Relief Defendant stated that her official title was Chief Operating Officer because she oversaw operation of the facility, but she stated that she had no training and held no licenses in the securities industry.  *Id*. at 16:10-24.  In addition, Katherine Nadel testified that she did not work full time, that her hours varied on a daily basis and she estimated her hours worked per week as "[s]ometimes 15, sometimes 50."  *Id*. at 17:15-25.  Further, when asked whether she "ha[d] any responsibilities at any time at [WDNC] for the operation of the business itself," she responded "No."  *Id*. at 20:9-12.  Katherine Nadel also stated that although she acted as WDNC's corporate secretary, *see id*. at 16:25-17:9, she had no responsibilities for maintaining the books and records.  *Id*. at 21:7-9.

---

[22]     During the Commission's case-in-chief, it sought leave to admit the August 3, 2011 deposition testimony of Katherine Nadel in lieu of calling her as a witness at the hearing. *See* Hrg. Tr. at 593:3-6.  There being no objection from Defendants' counsel, the Court admitted the deposition testimony.  *See* Hrg. Tr. at 593:16-22; Pl.'s Hrg. Ex. 190.

With respect to RIA, the Relief Defendant stated in her deposition that she was a partner, but nevertheless could not clarify whether she actually owned any part of the business or whether she received distributions, stating only that "I may have been paid a salary from there, but I don't know." *Id*. at 21:10-22:4.  Her primary knowledge concerning her partnership role at RIA seemed to be the fact that she signed RIA's tax returns.  *Id*. at 24:3-9.  In addition, Relief Defendant stated that she could not identify a distinction between the businesses of WDNC and RIA, that she had no role in running or operating RIA and contributed no capital to the RIA partnership.  *Id*. at 30:5-14.

Notwithstanding this earlier deposition, the testimony provided by the Relief Defendant at the damages hearing differed considerably with respect to the duration of her employment and the range of her responsibilities at WDNC and RIA.  For instance, during the hearing, Relief Defendant testified that she had worked at WDNC since 1987 as Chief Operating Officer and Corporate Secretary and had varied roles, including: responsibility for written supervisory procedures for both WDNC and RIA, for human resources and for keeping current with publications.  Hrg. Tr. at 601:9-602:3.  Specifically, Relief Defendant stated that she was "in charge of personnel," *id*. at 603:18, was responsible for the "physical plants,"[23] *id*. at 605:24-606:17, kept track of the books and corporate meeting minutes, represented the company in the community and otherwise held a supervisory role which included mediating territorial disputes among the brokers.  *Id*. at 606:19-609:4.  In addition, Relief Defendant stated that she worked a total of approximately 35 hours per week between 2007 and 2009 and considered her work to be full-time.  *Id*. at 609:5-10.

---

[23]     Despite testifying that the physical structure housing RIA and WDNC was owned by Emancipation Corporation, Relief Defendant testified that she did not work for Emancipation Corporation and did not perform the facilities work on its behalf.  Hrg. Tr. at 636:25-637:17.

In addition to the discrepancies between the Relief Defendant's deposition and hearing testimony, the facts demonstrate that payments from WDNC and RIA to her were altogether inconsistent.  For example, of the total $807,346.52 that the Commission seeks to disgorge, Relief Defendant received $435,800 in 2007 alone.  *See* Pl.'s Hrg. Ex. 20 at 2 (Distribution of $210,800 from RIA); Pl.'s Hrg. Ex. 138 ¶ 20 (receipt of $225,000 from WDNC).  However, in calendar years 2008 and 2009, the Relief Defendant's combined payments from RIA and WDNC totaled $235,559.92 and $135,986.60 respectively.  *See* Pl.'s Hrg. Exs. 20 at 2, 4; 173 at 18; 138 ¶ 20.  Further, when Relief Defendant's compensation is broken out separately, the difference in amounts between 2007 and 2009 are even more apparent.  For instance, with regard to payments from WDNC, Relief Defendant purportedly received $225,000 in 2007, $49,999.92 in 2008 and $41,666.60 in 2009.  *See* Pl.'s Hrg. Ex. 138 ¶ 20.  As to payments from RIA, in which Relief Defendant had no role and otherwise made no capital contribution, *see* Pl.'s Hrg. Ex. 176 at 30:9-14, she nevertheless received $210,800 in 2007, $185,560 in 2008 and $94,320 in 2009. *See* Pl.'s Hrg. Exs. 20 at 2, 4; 173 at 18.

When confronted at her deposition about the lopsided payments from WDNC between 2007 and 2009, Relief Defendant's only answer was that she "must have been doing less work." Pl.'s Hrg. Ex. 176 at 36:2:37:2.  Further, comparing Relief Defendant's payments from WDNC to those of Warren Nadel's executive assistant, Ethel Waldron, for the same period lends credence to the assertion that Relief Defendant's payments had little if any relationship with the scope and duration of her duties.  *See* Pl.'s Hrg. Ex. 138 ¶ 20 (noting both Relief Defendant's and Ethel Waldron's payments from WDNC for 2007-2009 and confirming the linear nature of Ethel Waldron's payments when compared to Relief Defendant's payments).

After considering the Relief Defendant's deposition transcript and hearing testimony as well as the evidence presented concerning the overall amount of payments received by her from both WDNC and RIA for what she asserts were services rendered, the Court finds that Relief Defendant does not possess a legitimate claim to the funds.  Most troubling to the Court, in addition to the Relief Defendant's contradictory testimony, is the overall disjointed amounts of compensation she received, for which she provided no plausible explanation.  In addition, whatever her ultimate role may have been, the Court is hard pressed to find plausible the fact that in 2007 alone, Relief Defendant's contributions, in the form of services performed, warranted a total gross payment from WDNC and RIA of $435,800 — especially when compared to payments made in 2008 and 2009.  In addition, the fact that Ethel Waldron's payments remained altogether consistent during this same time period further belies the notion that the payments made to Relief Defendant were in consideration of the services she performed.

In light of the above information, the Court finds that the Relief Defendant remained in possession of ill-gotten gains to which she had no rightful claim.  Thus, disgorgement is appropriate here.  Indeed, in a case such as this, "the broad equitable powers of the federal courts can be employed to recover ill[-]gotten gains for the benefit of the victims of wrongdoing, whether held by the original wrongdoer or by one who has received the proceeds after the wrong." *S.E.C. v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998) (alteration added).  *See U.S. Commodity Futures Trading Comm'n v. EJS Capital Mgmt., LLC*, No. 14 CV 3107, 2015 WL 5679688, at *4 (S.D.N.Y. Sept. 24, 2015) (noting that disgorgement from a relief or nominal defendant is appropriate where relief defendant is "in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in the underlying securities or commodity futures enforcement action"); *S.E.C. v. China Energy Sav.*

*Tech., Inc.*, 636 F. Supp. 2d 199, 204 (E.D.N.Y. 2009) ("District courts are authorized to order disgorgement from parties who, though not directly involved, profit from a fraud and have no just claim to their profits."); *see also S.E.C. v. Egan,* 856 F. Supp. 401, 402 (N.D. Ill. 1993) ("To be sure, Relief Defendants may not have been directly culpable in the securities violations, but what the SEC seeks to have them disgorge are the benefits that they derived from the violations by the culpable defendants."); *S.E.C. v. Ross*, 504 F.3d 1130, 1142–44 (9th Cir. 2007) (suggesting that a "mere puppet" or "empty vessel into which the true wrongdoers funneled their proceeds" would be a nominal defendant).

The Court respectfully recommends to Judge Kuntz that disgorgement in the amount of $807,346.52, coupled with prejudgment interest in the amount of $156,033.03, for a total overall amount of $963,379.85, be awarded to the Commission.

## IV.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Kuntz that:

(1) the Commission's request for permanent injunctive relief against Defendants be granted;

(2) the Commission be awarded disgorgement in the amount of $10,776,687.62;

(3) the Commission be required to submit a revised prejudgment interest calculation based upon the deduction of $183,026.68 from total disgorgement, this amount representing clearing charges paid by Defendants to RBC to execute the cross-trades during the period January 1, 2007 through December 31, 2009;

(4) Defendants be found jointly-and-severally liable for the total amount of disgorgement and prejudgment interest to be awarded;

(5) a third-tier civil penalty be imposed upon Defendants in the amount of $1,000,000; and

(6)   Relief Defendant be ordered to disgorge $807,346.52, coupled with prejudgment interest in the amount of $156,033.03, for a total overall amount of $963,379.85.

## V.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* FED. R. CIV. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable William F. Kuntz, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Kuntz prior to the expiration of the fourteen (14) day period for filing objections**. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. MerchantsBank*, 84 F.3d 52, 60 (2d Cir. 1996).

                                                              **SO ORDERED**.

Dated: Central Islip, New York
           February 11, 2016

                                                              /s/ A. Kathleen Tomlinson
                                                              A. KATHLEEN TOMLINSON
                                                              U.S. Magistrate Judge